**E.PIPHANY, INC., Plaintiff,**

v.

**ST. PAUL FIRE & MARINE INSURANCE CO., Defendant.**

**No. C 08–02621 JW.**

United States District Court, N.D. California, San Jose Division.

Dec. 16, 2008.

David A. Gauntlett, James A. Lowe, Christopher Lai, Gauntlett & Associates, Irvine, CA, for Plaintiff.

Bruce D. Celebrezze, Michael A. Topp, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, CA, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S DUTY TO DEFEND; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

JAMES WARE, District Judge.

### I. INTRODUCTION

E.piphany ("Plaintiff") brings this diversity action against St. Paul Fire & Marine Insurance Co. ("Defendant"), alleging breach of contract and seeking declaratory relief under 28 U.S.C. § 2201. Plaintiff insurance policyholder alleges that Defendant insurance carrier had a duty to defend Plaintiff in an underlying litigation ("Underlying Action"),[1] pursuant to the terms of the parties' insurance policy ("Policy"), and that Defendant violated the terms of the Policy by failing to provide a defense.

Presently before the Court are the parties' cross-motions for summary judgment.[2] The Court conducted a hearing on October 27, 2008. Based on the papers submitted to date and oral argument, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment and DENIES Defendant's Cross-Motion for Summary Judgment.

### II. BACKGROUND

#### A. Undisputed Facts

Starting on June 24, 2002, Plaintiff was covered by Technology Global Companion Commercial Liability Protection, as part of an overall Policy[3] taken out with Defendant.[4] Coverage under the Policy continued until June 24, 2003. (*Id.*) In relevant parts, the Policy provided as follows:

> **Personal injury liability.** We'll pay amounts any protected person is legally required to pay as damages for covered personal injury that:
>
> • results from your business activities
>
> • is caused by a personal injury offense committed while this agreement is in effect.
>
> *Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.
>
> *Personal injury offense* means any of the following offenses ...
>
> • Libel, or slander, in or with covered material
>
> • Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others ...
>
> *Covered material* means any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet.
>
> **Advertising Injury Liability.** We'll pay amounts any protected person is

---

1. *Sigma Dynamics, Inc. v. E.piphany, Inc.,* Case No. C 04–0569 MJJ, 2004 WL 3669840 (N.D. Cal. filed February 10, 2004).

2. (Plaintiff's Motion for Partial Summary Judgment on St. Paul Fire & Marine Insurance Company's Duty to Defend and Breach of Its Duty to Defend, hereafter, "Motion," Docket Item No. 5; Defendant's Cross-Motion for Summary Judgment, hereafter, "Defendant's Motion," Docket Item No. 27.)

3. Policy number TE09405602.

4. (Declaration of James C. Zacharski in Opposition to Plaintiff's Partial Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment, Ex. A, hereafter, "Zacharski Decl.," Docket Item No. 29.)

legally required to pay as damages for covered advertising injury that:

● results from the advertising of your products, your work, or your completed work; and

● is caused by an advertising injury while this agreement is in effect . . .

*Advertising Injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses:

● Libel, or slander, in or with covered material.

● Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others . . .

*Advertising* means attracting the attention of others by any means for the purpose of:

● seeking customers or supporters; or

● increasing sales or business.

*Advertising material* means any covered material that:

● is subject to copyright law; and

● others use and intend to attract attention in their advertising . . .

**Right and duty to defend a protected person.** We'll have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service . . .

***Exclusions—What This Agreement Won't Cover*** . . .

**Poor quality or performance.**[5] We won't cover advertising injury that results from the failure of your products, your work, or your completed work to conform with advertised quality or performance . . . (*Id.*)

On February 10, 2004, Plaintiff was sued by Sigma Dynamics, Inc. ("Sigma") in the Northern District of California. On July 15, 2004, Sigma filed a First Amended Complaint ("Underlying Complaint"), which alleged causes of action for false advertising and unfair competition under 15 U.S.C. § 1125(a) and California Business & Professions Code §§ 17200, 17500.[6] The Underlying Complaint alleged, in relevant part:

Sigma Dynamics and E.piphany are direct competitors in the market for software products that enable businesses to more efficiently manage and optimize their customer interactions. One impor-

**5.** The Court notes Defendant's contention that this "failure to conform" exclusion eliminates a potential for coverage. (Defendant's Memorandum of Points and Authorities (1) in Opposition to Plaintiff's Motion for Partial Summary Judgment and (2) in Support of St. Paul's Cross–Motion for Summary Judgment at 14, hereafter, "Opposition," Docket Item No. 28.) This case, however, is not related to the performance of Plaintiff's products. Rather, this action is based on alleged trade libel committed by Plaintiff, with respect to negative comparisons Plaintiff made about competitors vis-a-vis Plaintiff's products. It is irrelevant whether Plaintiff's products actually possessed the attributes advertised by Plaintiff.

**6.** (Declaration of Ryan J. Padden in Support of Plaintiff's Motion for Partial Summary Judgment, Ex. 1, hereafter, "Padden Decl.," Docket Item No. 7.)

tant differentiator between competing products in this market is whether the software is written in Java and is fully compliant with J2EE application server technology ... Since at least mid–2002, E.piphany has been falsely advertising its product suite as "all Java" and "fully J2EE." E.piphany's products are not "all Java" or "fully J2EE," and E.piphany's misrepresentations about the underlying architecture and implementation of its products have given it an unfair and undeserved advantage over competitors, some of which do offer, "all Java" and "fully J2EE" software solutions. E.piphany's misleading statements have caused prominent industry and financial analysts to publish unfair product comparisons and reviews, which have compounded the confusion by E.piphany's direct statements to customers and prospective customers ... (Underlying Complaint ¶ 1.)

Using every channel at its disposal, E.piphany has made, and continues to make, false and misleading statements about its products and their performance. For example, at some point in 2002, E.piphany began advertising that its product suite is "all Java" and "fully J2EE." (*Id.* ¶ 16.) E.piphany has made its claim to be "all Java" and "fully J2EE" a core part of its positioning in the market, and claims a competitive advantage over other software makers based on that alleged differentiator. (*Id.* ¶ 17.) Despite making public claims ... that it "is the first full suite CRM vendor to market a complete product suite built on J2EE" and that it has released "the only component-based, fully-J2EE complete CRM suite available," E.piphany's products have never been "all Java" nor "fully J2EE." (*Id.* ¶ 18.)

On October 17, 2002, E.piphany issued its Q302 earnings press release [which stated] "the launch of E.6 Service in August completed the E.6 platform, the only component-based, fully-J2EE complete CRM suite available." (*Id.* ¶ 23.) On October 23, 2003, during E.piphany's Q303 earnings conference call, E.piphany's CEO claimed that E.Phiphany is "the only full-footprint vendor who actually has a full J2EE architecture ... we're the only vendor that has that, and I think we have a couple year lead." (*Id.* ¶ 26.) On January 14, 2003, E.piphany published a press release entitled *E.piphany Advances Relationship with IBM by Delivering Open–Standards CRM,* which claimed that the E.piphany E.6 CRM suite provides "a fully integrated and certified one-vendor solution that delivers a true J2EE, standards-based architecture." (*Id.* ¶ 28.)

On August 4, 2003, E.piphany published a press release entitled *E.piphany Announces Support of BEA Weblogic Platform 8.1,* which claimed that "E.piphany offers the only full-footprint CRM suite natively built on a service-oriented J2EE architecture." (*Id.* ¶ 29.) E.piphany issued a worldwide press release on August 20, 2002, which stated that "E.piphany is the first end-to-end CRM suite designed and built on a unified J2EE-based platform." (*Id.* ¶ 35.)

The foregoing literally false, deceptive, and misleading representations by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill, and have caused potential purchasers of Sigma's products and services to choose E.piphany's instead of Sigma's. Such represen-

tations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill. (*Id.* ¶ 43.)

On July 22, 2004, Plaintiff sent a letter to Defendant, which tendered to Defendant the defense of claims asserted in the Underlying Complaint. (Padden Decl., Ex. 3.) On July 27, 2004, Defendant informed Plaintiff that Defendant did not have a duty to defend Plaintiff under the terms of the Policy, on the grounds that the Underlying Complaint did not allege any covered "personal injury" or "advertising injury." (*Id.,* Ex. 4.) On September 21, 2005, Plaintiff attempted, through counsel, to re-tender the defense of Sigma's claims, which Defendant again denied on February 17, 2006. (*Id.,* Exs. 8, 9.)

Presently before the Court are Plaintiff's Motion for Partial Summary Judgment on Defendant's Duty to Defend and Breach of Its Duty to Defend and Defendant's Cross–Motion for Summary Judgment.

### III. STANDARDS

▆ Although motions for partial summary judgment are common, Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not contain an explicit procedure entitled "partial summary judgment." As with a motion under Rule 56(c), partial summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of partial summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Ca-*

*trett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The non-moving party must then identify specific facts "that might affect the outcome of the suit under the governing law," thus establishing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e).

▆ When evaluating a motion for partial or full summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. *See, e.g. Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987). In such a case, partial summary judgment is inappropriate. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

▆ The filing of cross-motions for partial summary judgment or summary

judgment does not necessarily mean that the material facts are, indeed, undisputed. The denial of one motion does not necessarily require the grant of another. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2000). The motions must be evaluated in accordance with the claim or defense which is the subject of the motion and in accordance with the burden of proof allocated to each party.

## IV. DISCUSSION

Plaintiff contends that the Complaint in the Underlying Action triggered Defendant's duty to defend, because the Underlying Complaint alleged "disparagement," and thus triggered the potential for coverage under the terms of the Policy. (Motion at 4–5.)

■■■ Under California law, a liability insurer has a broad duty to defend its insured against claims that create a potential for indemnity. *Montrose Chem. Corp. v. Sup.Ct.*, 6 Cal.4th 287, 295, 24 Cal. Rptr.2d 467, 861 P.2d 1153 (1993) (internal citations omitted). "The carrier must defend a suit which potentially seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). Since the duty to defend is broader than the duty to indemnify, an insurer may have a duty to defend even though no damages are ultimately awarded. *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993).

■■■ When analyzing the duty to defend under California law, a court looks to the underlying complaint and "all facts known to the insurer from any source." *See Montrose Chem.Corp.*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. This is because "the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). However, "[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 655, 31 Cal. Rptr.3d 147, 115 P.3d 460 (2005).

In this case, the Policy covers the offenses of "personal injury" and "advertising injury," which are defined in the Policy as "[m]aking known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others." (Zacharski Deck, Ex. A.) The parties do not dispute that the Policy, by its explicit terms, covers "disparagement." Rather, the parties contest whether the Underlying Complaint made allegations sufficient to demonstrate a potential for "disparagement" coverage, because the E.piphany publications alleged in the Underlying Complaint did not specifically identify Sigma or any Sigma products, but rather made allegedly false representations about E.piphany's own products.

■■■ In California, a disparaging statement about a competitor's product that causes the competitor to suffer pecu-

niary damages is actionable as trade libel.[7] *See Microtec Research, Inc. v. Nationwide Mut. Ins. Co.,* 40 F.3d 968, 972–73 (9th Cir.1994). California courts have held that to state a disparagement claim within the meaning of the Policy here at issue, the underlying plaintiff must allege that defendant made false, injurious, or derogatory statements about a plaintiff's products, which caused it to suffer pecuniary damages. *See, e.g., id.; Truck Ins. Exchange v. Bennett,* 53 Cal.App.4th 75, 89, 61 Cal. Rptr.2d 497 (1997). Trade libel and product disparagement are "injurious falsehoods that interfere with business. Unlike classic defamation, they are not directed at the plaintiff's personal reputation but rather at the goods a plaintiff sells or the character of his other business." *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.,* 838 F.2d 346, 351 (9th Cir.1988).

California courts have not explicitly determined whether a cause of action for disparagement can exist where a publication does not expressly identify a disparaged product or business. Precedent does suggest, however, that disparagement by implication is actionable under California law. In *Blatty v. New York Times Co.,* the California Supreme Court addressed First Amendment limits on defamation claims, including claims for trade libel. 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986). The Court noted that, as a threshold matter, "in defamation actions the First Amendment ... requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way." *Id.* at 1042, 232 Cal.Rptr. 542, 728 P.2d 1177. The Court went on to clarify that "to be referred to specifically, we emphasize, the plaintiff need not be mentioned by name, but may be identified by clear implication." *Id.* at 1044 n. 1, 232 Cal.Rptr. 542, 728 P.2d 1177.

At least one other jurisdiction has specifically addressed the issue of whether disparagement coverage can be triggered when a policy holder was not alleged to have disparaged a specifically identified product or business. *See Knoll Pharmaceutical Co. v. Automobile Ins. Co. of Hartford,* 152 F.Supp.2d 1026, 1037–38 (N.D.Ill.2001) (applying Illinois law).[8] In *Knoll,* the policy holder was insured for advertising injury and personal injury, which were defined as "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *Id.* at 1034. In the litigation underlying the insurance coverage dispute in *Knoll,* the plaintiffs alleged that the policyholder had advertised its thyroid drug as "more effective than or superior to the other drugs available to treat hyperthyroidism" and had wrongly claimed that its drug was "not bioequivalent to competing products," thereby dis-

---

7. *But see National Union Fire Ins. Co. of Pittsburgh, Pa. v. Seagate Technology, Inc.,* 233 Fed.Appx. 614 (9th Cir.2007) (finding under California law that a carrier had a duty to defend when the relevant policy provided for trade libel coverage, and where the underlying complaint alleged statements by the policy holder that compared its products to those of competitors without specifically identifying the competitors or their products).

8. The Court is aware that *Knoll* is distinguishable from this case in that *Knoll* dealt with a situation in which the plaintiffs in the underlying litigation were not the parties at whom the alleged disparaging statements were directed. Instead, the plaintiffs were consumers who sought lower-priced thyroid drugs, and not the manufacturers of those drugs. Nonetheless, the Court finds the analysis of disparagement law instructive to the issue presently before the Court.

paraging competing manufacturers. *Id.* at 1036. Although the complaint in the underlying litigation did not allege disparagement of any specific competitors or products, the court in *Knoll* found a duty to defend because allegations of statements that the policyholder's drug was superior to other drugs were "disparaging in that they criticize the quality of other companies' ... products as being inferior." *Id.* at 1038. In other words, by claiming that its own product was not bioequivalent to competitor products, the policyholder had, by necessary implication, suggested that competitors' products possessed different and inferior indicia of biological activity.

■ In this case, the Underlying Complaint makes numerous allegations that suggest a claim for disparagement by implication.[9] The Underlying Complaint alleges that Plaintiff falsely stated that it was the "only" producer of "all Java" and "fully J2EE" software solutions, which was an "important differentiator" between competing products, even though some competitors offered products with these exact features. (Underlying Complaint ¶ 1.) The Underlying Complaint goes on to enumerate a host of specific instances in which Plaintiff made these allegedly false claims, and in which Plaintiff purportedly stated that it was the "first end-to-end CRM suite designed and build on a unified J2EE-based platform" and had "a couple of year lead" on competitors in this particular product market. (*Id.* ¶¶ 16–18, 23–35.) The Underlying Complaint further alleges that Plaintiff and Sigma were di-

rect competitors in this market and that Sigma's market share, sales, and reputation were damaged as a result of Plaintiff's allegedly false statements. (*Id.* ¶¶ 1, 43.)

Taken together, these allegations show a claim for disparagement by "clear implication." *Blatty,* 42 Cal.3d at 1044 n. 1, 232 Cal.Rptr. 542, 728 P.2d 1177. That is, Plaintiff's alleged statement that it was, for example, "the only component-based, fully-J2EE complete CRM suite available" necessarily suggests that competitor products did not have such capabilities. Plaintiff's alleged claim of having "a couple of year lead" on competitors also necessarily suggests that competitors were well behind Plaintiff in terms of technology development. In addition, the Underlying Complaint alleges that Plaintiff and Sigma were competitors, that Plaintiff's competitors actually were selling "all Java" and "fully J2EE" software at the time of Plaintiffs misrepresentations, and that Sigma suffered pecuniary and reputational damage as a result of these purported misrepresentations. The gravamen of the Underlying Complaint, therefore, is that Plaintiff made false claims about the superiority of its own products, which clearly and necessarily implied the inferiority of Sigma's competing products, resulting in damages to Sigma. The Court finds that the statements alleged in Underlying Complaint had the potential to give rise to disparagement liability if ultimately proven to be "injurious falsehoods that interfere[d] with [Sigma's] business." *Aetna,* 838 F.2d at 351. The fact that the "injuri-

---

**9.** The fact that the Underlying Complaint does not specifically allege a disparagement cause of action is of no moment, because the scope of the duty to defend "does not depend on the labels given to the causes of action" and can be found merely by "comparing the allegations of the complaint with the terms of the policy." *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.,* 100 Cal.App.4th 1017, 1034, 123 Cal. Rptr.2d 256 (2002); *Montrose,* 6 Cal.4th at 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Indeed, the duty to defend exists "until it has been shown that there is *no* potential for coverage." *Id.* (emphasis in original).

ous falsehoods" alleged were only directed at Sigma by implied comparison with Plaintiff's products does not alter this outcome.

In sum, the Court finds that the Underlying Complaint contained disparagement allegations that implicated the potential for "personal injury" and "advertising injury" coverage under the Policy, and thus triggered Defendant's duty to defend. *Montrose*, 6 Cal.4th at 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Since Defendant undisputedly refused Plaintiff's tender of the defense in the Underlying Action, the Court finds that Defendant breached its duty to defend.

Accordingly, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Defendant's breach of its duty to defend and DENIES Defendant's Cross–Motion for Summary Judgment.

### V. CONCLUSION

The Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Defendant's duty to defend. The Court DENIES Defendant's Cross–Motion for Summary Judgment.

The Court sets a Case Management Conference for **January 12, 2009 at 10 a.m.** On or before **January 5, 2009,** the parties shall file a Joint Case Management Statement. The Statement shall include, among other things, the parties' position with respect to claims remaining in this case. If the parties agree that the case is ripe for a Final Judgment, the parties shall include their proposed forms of Judgment as part of their Joint Statement.