Filed 6/12/14

# IN THE SUPREME COURT OF CALIFORNIA

HARTFORD CASUALTY INSURANCE COMPANY,

           Plaintiff and Respondent,

           v.

SWIFT DISTRIBUTION, INC. et al.,

           Defendants and Appellants.

S207172

Ct.App. 2/3 B234234

Los Angeles County
Super. Ct. No. BC442537

Hartford Casualty Insurance Company (Hartford) issued a commercial general liability policy to Swift Distribution, Inc., doing business as Ultimate Support Systems (Ultimate), that covered "personal and advertising injury." This term included claims arising from "[o]ral, written, or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Ultimate, which sells the Ulti-Cart, was sued in federal district court by Gary-Michael Dahl (Dahl), the manufacturer of the Multi-Cart. The suit included allegations of patent and trademark infringement, false designation of origin, and damage to business, reputation, and goodwill.

When Ultimate tendered defense of the suit to Hartford, Hartford denied coverage on the ground that the suit did not allege that Ultimate had disparaged Dahl or the Multi-Cart. The Court of Appeal agreed with Hartford that it had no

duty to defend and expressly disagreed with the reasoning in *Travelers Property Casualty Company of America v. Charlotte Russe Holding, Inc*. (2012) 207 Cal.App.4th 969 (*Charlotte Russe*).  We granted review to clarify the principles governing the scope of a commercial general liability insurer's duty to defend an insured against a claim alleging disparagement.

We hold that a claim of disparagement requires a plaintiff to show a false or misleading statement that (1) specifically refers to the plaintiff's product or business and (2) clearly derogates that product or business.  Each requirement must be satisfied by express mention or by clear implication.  Because Dahl's suit contains no allegation that Ultimate clearly derogated the Multi-Cart, we find no claim of disparagement triggering Hartford's duty to defend, and we affirm the judgment of the Court of Appeal.

## I.

Ultimate sells a product called the Ulti-Cart, a multi-use cart marketed to help musicians load and transport their equipment.  On January 26, 2010, Dahl filed an action in federal district court against Ultimate (the *Dahl* action).  The complaint alleged that Dahl held multiple patents on a similar convertible transport cart called the Multi-Cart, which he had sold commercially since 1997.  The Multi-Cart was described as a collapsible cart capable of being manipulated into multiple configurations and typically used to transport music, sound, and video equipment.

According to the complaint, Ultimate impermissibly manufactured, marketed, and sold the Ulti-Cart, and thereby infringed on Dahl's patents and trademarks and diluted the Multi-Cart trademark.  Dahl asserted that Ultimate's false and misleading advertisements and use of a "nearly identical mark" were likely to cause consumer confusion or mistake, or to deceive the public "as to the affiliation, connection, or association" of the two parties.  He also alleged unfair

2

competition, misleading advertising, breach of contract, and claims based on the violation of two nondisclosure agreements. The complaint attached Ultimate's advertisements, which did not name the Multi-Cart or any other product.

Ultimate delivered the suit to Hartford for defense under the commercial liability policy issued by Hartford for the period of January 29, 2009 to January 29, 2010 (the Hartford policy). The Hartford policy's insuring agreement provided: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for . . . 'personal and advertising injury' to which this insurance does not apply." It defined "personal and advertising injury," in pertinent part, as "injury . . . arising out of . . . [o]ral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." The insuring agreement did not provide a definition for the term "disparages."

Ultimate argued that the *Dahl* action involved a claim of disparagement covered by the Hartford policy's definition of "personal and advertising injury." But Hartford found no potential claim of disparagement and denied any duty to defend or indemnify Ultimate in the underlying litigation. Citing *Total Call Internat., Inc. v. Peerless Ins. Co.* (2010) 181 Cal.App.4th 161 (*Total Call*), Hartford's counsel explained in a letter to Ultimate that there could be no disparagement in the absence of a specific statement about a competitor's goods. It further found that any possibility of coverage would have been precluded by the policy's exclusion provisions, one of which denied coverage for personal or advertising injuries arising out of violations of intellectual property rights.

3

On July 27, 2010, Hartford filed a complaint seeking a declaratory judgment that it had no duty to defend or indemnify Ultimate in the *Dahl* action. The complaint argued that the allegations in the underlying action did not satisfy the elements of a disparagement offense. While the action was pending, the court in the *Dahl* action granted Ultimate's motion for summary adjudication on the claims of patent infringement, and the *Dahl* action settled. Hartford and Ultimate each filed motions for summary judgment or, in the alternative, summary adjudication. The superior court granted Hartford's motion for summary judgment.

Ultimate appealed, and the Court of Appeal affirmed. The Court of Appeal observed that the *Dahl* action did "not allege that Ultimate's advertisements specifically referred to Dahl by express mention" and that "Dahl did not allege that Ultimate's publication disparaged Dahl's organization, products, goods, or services" by reasonable implication. Because "Dahl was precluded from recovery on a disparagement theory," the court reasoned, "Dahl alleged no claim for injurious false statement or disparagement that was potentially within the scope of the Hartford policy coverage for advertising injury," and Hartford had no duty to defend Ultimate in the underlying action. Further, the Court of Appeal "disagree[d] with the theory of disparagement apparently recognized" in *Charlotte Russe*, *supra*, 207 Cal.App.4th 969, although it acknowledged that *Charlotte Russe* was distinguishable on its facts.

We granted review.

## II.

A trial court properly grants a motion for summary judgment where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "Because this case comes before us after the trial court granted

4

a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

As discussed below, we conclude that the Court of Appeal correctly decided the issue before us.

## A.

An insurer's duty to indemnify and its duty to defend an insured "lie at the core of the standard policy." (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 958.) The duty to defend is broader than the duty to indemnify. (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 (*Horace Mann*).) "Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured, or because the actual judgment is for damages not covered under the policy." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1185 (*Ringler*).)

The duty to defend is guided by several well-established principles. An insurer owes a broad duty to defend against claims that create a potential for indemnity under the insurance policy. (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 277–278.) An insurer must defend against a suit even " 'where the evidence suggests, but does not conclusively establish, that the loss is not covered.' "

5

(*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299 (*Montrose*).)

"Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. [Citation.]  But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered."  (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654.)  This includes all facts, both disputed and undisputed, that the insurer knows or " 'becomes aware of' " from any source (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308) "if not 'at the inception of the third party lawsuit,' then 'at the time of tender' " (*Swain v. California Casualty Ins. Co.* (2002) 99 Cal.App.4th 1, 8).  "Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability."  (*Scottsdale*, *supra*, 36 Cal.4th at p. 654.)  Thus, "[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage."  (*Id.* at p. 655.)  In general, doubt as to whether an insurer owes a duty to defend "must be resolved in favor of the insured."  (*Ringler*, *supra*, 80 Cal.App.4th at p. 1186.)

While the duty to defend is broad, it is "not unlimited; it is measured by the nature and kinds of risks covered by the policy."  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 (*Waller*).)  In an action seeking declaratory relief concerning a duty to defend, "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall

6

within policy coverage; the insurer must prove it *cannot*." (*Montrose*, *supra*, 6 Cal.4th at p. 300.) Thus, an insurer may be excused from a duty to defend only when " 'the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage.' " (*Ibid.*, italics omitted.) In a "mixed" action, where some claims are potentially covered while others are not, "the insurer has a duty to defend as to the claims that are at least potentially covered." (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 47.)

**B.**

In determining whether a claim creates the potential for coverage under an insurance policy, "we are guided by the principle that interpretation of an insurance policy is a question of law." (*Waller*, *supra*, 11 Cal.4th at p. 18.) "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.)" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822.) In determining this intent, "[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller*, at p. 18.) We consider the " 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' " (*AIU*, at p. 822.) We must also "interpret the language in context, with regard to its intended function in the policy." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.)

The issue in this case is whether the *Dahl* action against Ultimate included a claim of disparagement covered by the Hartford policy. According to section 629 of the Restatement Second of Torts (1977), "[a] statement is disparaging if it is understood to cast doubt upon the quality of another's land, chattels or intangible things, or upon the existence or extent of his property in them, and ¶

7

(a) the publisher intends the statement to cast the doubt, or ¶ (b) the recipient's understanding of it as casting the doubt was reasonable." The term "disparagement" in the context of an insurance policy, in light of its proximity to the terms "libel" and "slander," suggests it may be understood as a common law tort: Whereas defamation, which includes libel and slander, concerns damage to the reputation of a person or business, disparagement concerns damage to the reputation of products, goods, or services. (See *Total Call*, *supra*, 181 Cal.App.4th at p. 169.) Yet the torts of disparagement and defamation " 'protect different interests and have entirely different origins in history.' " (*Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 548–549.)

Disparagement emerged from the common law tort doctrine of slander of title. In *Burkett v. Griffith* (1891) 90 Cal. 532, the court described slander of title as an action "against one who falsely and maliciously disparages the title of another to property, whether real or personal, and thereby causes him some special pecuniary loss or damage. In order to maintain the action, it is necessary to establish that the words spoken were false, and were maliciously spoken by the defendant, and also that the plaintiff has sustained some special pecuniary damage as the direct and natural result of their having been so spoken." (*Id.* at p. 537; see *Hill v. Allan* (1968) 259 Cal.App.2d 470, 489 ["Disparagement or slander of title is a publication made without a privilege or justification of matter that is untrue and is disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct . . . results in pecuniary loss from the impairment of vendability thus caused."]; *The Law of Commercial Disparagement: Business Defamation's Impotent Ally* (1953) 63 Yale L.J. 65, 75.) The doctrine expanded to include statements disparaging the quality of property rather than simply its ownership, a form of disparagement commonly referred to as trade libel. (See *Erlich v. Etner*

8

(1964) 224 Cal.App.2d 69 (*Erlich*).)  Eventually, disparagement came to encompass a broader theory of economic or commercial injury caused by a false, derogatory statement.  (See Prosser & Keeton, Torts (5th ed. 1984 & 1988 supp.) § 128, pp. 962–963; *Trade Libel:  Theory and Practice Under the Common Law, the Lanham Act, and the First Amendment* (1999) 89 Trademark Rep. 826, 827.)

  "Confusion surrounds the tort of 'commercial disparagement' because not only is its content blurred and uncertain, so also is its very name.  The tort has received various labels, such as 'commercial disparagement,' 'injurious falsehood,' 'product disparagement,' 'trade libel,' 'disparagement of property,' and 'slander of goods.'  These shifting names have led counsel and the courts into confusion, thinking that they were dealing with different bodies of law.  In fact, all these labels denominate the same basic legal claim."  (5 McCarthy on Trademarks and Unfair Competition (4th ed.) § 27:100, fn. omitted.)  Disparagement is often included now as "a specific example of the more general principle of injurious falsehood."  (Reinhard, *The Tort of Disparagement and the Developing First Amendment* (1987) 1987 Duke L.J. 727, 729; *see id*. at p. 729, fn. 21 [comparing the Restatement of Torts (1938), which titled Division Six as "Disparagement," with the Restatement Second of Torts (1977), which titled Division Six as "Injurious Falsehood (Including Slander of Title and Trade Libel)"].)  Under the definition of an injurious falsehood, "[o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if ¶ (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and ¶ (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."  (Rest.2d Torts, § 623A.)

  California courts have defined disparagement in the commercial liability context by reference to the common law.  In *Nichols v. Great American Ins.*

9

*Companies* (1985) 169 Cal.App.3d 766 (*Nichols*), the policyholders were sued by California Satellite Systems (Calsat), an official distributor of the Home Box Office (HBO) entertainment service, for selling and distributing devices to illegally intercept the HBO signal. Calsat sought injunctive relief, claiming irreparable injury from loss of business opportunities, reputation, and good will to its exclusive HBO license. (*Id.* at p. 770.) In considering the scope of disparagement under a "personal injury" provision, the court quoted *Erlich*, *supra*, 224 Cal.App.2d 69, which defined the tort of trade libel as "an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. . . . 'Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general.' " (*Id*. at p. 73.) The court in *Nichols* noted that trade libel "requires (at a minimum): (1) a publication; (2) which induces others not to deal with plaintiff; and (3) special damages." (*Nichols*, at p. 773.) The court then held that "[t]he necessary element of a defamatory publication or utterance is missing from the complaint and cannot be supplied by reference to reports in which the defamatory innuendo appears only inferentially." (*Id.* at p. 775.)

In *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, the court interpreted a "personal injury" provision with a disparagement clause like the one at issue here as providing coverage for "product disparagement and trade libel as well as defamation." (*Id.* at p. 1035.) The underlying complaint alleged that Lamb, the policyholder, contacted the competitor's costumers and falsely accused the competitor's products of infringing on his patent. The court noted that "the term 'disparagement' has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. [Citation.]" (*Ibid.*) It continued: "Whether

10

characterized as a trade libel or product disparagement, an injurious falsehood directed at the organization or products, goods, or services of another falls within the coverage of the [insurance] policy." (*Ibid*.) Quoting the definition of trade libel stated in *Nichols*, the court concluded that allegations in the underlying complaint "clearly constituted a 'publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general.' " (*Ibid*., quoting *Nichols*, *supra*, 169 Cal.App.3d at p. 773.)

These cases and others have understood disparagement, for purposes of commercial liability insurance coverage, to mean a knowingly false or misleading publication that derogates another's property or business and results in special damages. (See, e.g., *Cort v. St. Paul Fire and Marine Ins. Companies, Inc.* (9th Cir. 2002) 311 F.3d 979, 986; *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.* (9th Cir. 1994) 40 F.3d 968, 972; *Aetna Casualty and Surety Co., Inc. v. Centennial Ins. Co.* (9th Cir. 1988) 838 F.2d 346, 351 (*Aetna*); *Burgett, Inc. v. American Zurich Ins. Co.* (E.D.Cal. 2011) 830 F.Supp.2d 953, 962 (*Burgett*); *E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.* (N.D.Cal. 2008) 590 F.Supp.2d 1244, 1252 (*E.piphany*); *Lindsey v. Admiral Ins. Co.* (N.D.Cal. 1992) 804 F.Supp. 47, 52.)

## C.

In evaluating whether a claim of disparagement has been alleged, courts have required that the defendant's false or misleading statement have a degree of specificity that distinguishes direct criticism of a competitor's product or business from other statements extolling the virtues or superiority of the defendant's product or business. As explained below, disparagement involves two distinct but related specificity requirements. A false or misleading statement (1) must specifically refer to the plaintiff's product or business, and (2) must clearly

11

derogate that product or business. Each requirement must be satisfied by express mention or by clear implication.

In California, these requirements guided the reasoning of our decision in *Blatty v. New York Times Co*. (1986) 42 Cal.3d 1033 (*Blatty*), where we held under the First Amendment that all injurious falsehoods "must specifically refer to, or be 'of and concerning,' the plaintiff in some way." (*Id.* at p. 1042.) The plaintiff in *Blatty*, an author, sued the New York Times for damages, claiming the newspaper had improperly left the author's book off its best seller's list. The court held that the best seller's list could not "be reasonably understood to refer to Blatty or his novel by implication." (*Id.* at p. 1046.) We explained that where the "injuriously false [publication] concerns a group — here, books currently in print and their authors — the plaintiff faces a 'difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, [the] plaintiff[] may succeed. But where the group is large . . . the courts in California and other states have consistently held that plaintiffs cannot show that the statements were "of and concerning them." ' " (*Ibid.*) Further, the court said that "Blatty's claims also fail to effectively allege falsehood" because "the Times did *not* make the crucial false representation of which he complains — viz., that the list was an accurate compilation of actual book sales." (*Ibid*., fn. 2.) Thus, the court held that Blatty failed to sufficiently allege an injurious falsehood because the best seller's list did not expressly or by clear implication (1) refer to Blatty's novel or (2) derogate Blatty's novel by suggesting it was not a best seller.

Although *Blatty*, which involved a media defendant, relied heavily on the First Amendment value of maintaining "a broad zone of protection" for the press (*Blatty*, *supra*, 42 Cal.3d at p. 1041), the court used some language that could be read to apply more broadly to ordinary commercial disputes. In response to Blatty's argument that First Amendment concerns were inapplicable because the

best seller's list was commercial speech, the court said the list was not commercial speech *and* "[i]n any event, . . . commercial speech is *not* excluded from First Amendment protections." (*Id.* at p. 1048, fn. 3.) Further, the court said that "the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled 'defamation' " because "although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values." (*Id.* at p. 1043.)

Soon after *Blatty* was decided, its reasoning was applied to a disparagement claim against a nonmedia defendant. In *Hofmann Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390 (*Hofmann*), the court applied *Blatty* to a suit by a developer alleging that employees of a toxic chemical plant had committed trade libel and intentional interference with prospective economic advantage by publicly criticizing a housing development that the developer had planned to build next to the plant. (*Id.* at p. 403.) The dispute in *Hofmann* did not involve free press values, although it did involve free expression on a matter of public concern and a plaintiff (the developer) who "possesse[d] the attributes of a public figure." (*Id.* at p. 404.)

Subsequently, the court in *Total Call*, citing *Hofmann* and *Blatty*, applied the specific reference requirement to a purely commercial dispute involving allegations of product disparagement, among other claims. (*Total Call*, *supra*, 181 Cal.App.4th at p. 170.) The issue in *Total Call* was whether an insurer owed a duty to defend against a suit by two competitors alleging that Total Call sold prepaid telephone cards that did not provide the number of minutes advertised. (*Id.* at p. 165.) The insurance policy at issue, like the Hartford policy here, "provide[d] coverage for 'product disparagement and trade libel as well as defamation.' [Citation.]" (*Id.* at p. 169.) In evaluating whether the suit had

13

sufficiently alleged disparagement, the court took note of the specific reference requirement set forth in *Blatty* and said: "[T]he court [in *Blatty*] explained that '*all* injurious falsehood claims' sounding in defamation, however framed, are subject to requirements rooted in the First Amendment to the United States Constitution. ([*Blatty*, *supra*,] 42 Cal.3d at pp. 1043–1045, italics added.)  These requirements cannot be avoided by 'creative pleading' that 'affix[es] labels other than defamation to injurious falsehood claims.' (*Id.* at p. 1045.)  Among these requirements is the demand that the injurious falsehood 'specifically refer[]' to the derogated person or product. (*Id.* at p. 1046.)  To meet this demand at the pleading stage, a plaintiff must allege that 'the statement at issue either expressly mentions him or refers to him by reasonable implication.' (*Ibid.*)" (*Total Call*, at p. 170.)

The court in *Total Call* denied coverage after finding that Total Call's advertisements did not specifically refer to the plaintiffs in the underlying action expressly or by reasonable implication.  (*Total Call*, *supra*, 181 Cal.App.4th at p. 171.)  Although Total Call's advertisements falsely communicated to consumers the number of minutes they would receive, "this sort of communication, by itself, carries *no* implication that [the competitors'] comparable cards cost more or less than [Total Call's] cards; to ascertain such information, a consumer would have to consult [the competitors'] own advertising." (*Ibid.*)  Further, the court explained the allegation that "[Total Call's] falsehoods injured [the competitors'] reputation by reducing [their] market share and damaging the industry's collective reputation" was not sufficient to meet the specific reference requirement.  (*Ibid.*)

The court in *Total Call* did not examine whether the First Amendment concerns that limit restraints on false or misleading media speech apply with equal force to restraints on false or misleading commercial speech.  (Cf. *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563 (*Central Hudson*)

14

["[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."].) Nevertheless, even if the result is not compelled by the First Amendment, we believe *Total Call* was correct to apply the specific reference requirement to a disparagement claim against a nonmedia defendant in a purely commercial dispute. In the commercial context, as in the media context, "[t]he 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." (*Blatty*, *supra*, 42 Cal.3d at p. 1044.) This limitation serves the important objective of forestalling " 'vexatious lawsuits' " over perceived slights that do not specifically derogate or refer to a competitor's business or product. (*Ibid.*) Applying the specific reference requirement would not cause false or misleading commercial statements to go undeterred, as such statements may still result in liability under various claims other than disparagement, including patent or trademark infringement, false advertising, or unfair competition. (See, e.g., 35 U.S.C. § 271; 15 U.S.C. §§ 1114, 1125(a); Bus. & Prof. Code, §§ 17500, 17505, 17200.) What distinguishes a claim of disparagement is that an injurious falsehood has been directed *specifically* at the plaintiff's business or product, derogating that business or product and thereby causing that plaintiff special damages.

### D.

The specificity requirements discussed above significantly limit the type of statements that may constitute disparagement, especially since advertisements and promotional materials often avoid express mention of competitors. Nevertheless, courts have found certain kinds of statements to specifically refer to and derogate a competitor's product or business by clear implication.

15

In *E.piphany*, *supra*, 590 F.Supp.2d 1244, the court held that an insurer had a duty to defend where a competitor had sued the insured, E.piphany, for falsely claiming to be "the 'only' producer of 'all Java' and 'fully J2EE' software solutions, which was an 'important differentiator' between competing products, even though some competitors offered products with these exact features." (*Id.* at p. 1253.) The court held that these false statements "clearly and necessarily implied the inferiority of Sigma's competing products" and that "[t]he fact that the 'injurious falsehoods' alleged were only directed at Sigma by implied comparison with [E.piphany's] products does not alter this outcome." (*Id.* at pp. 1253–1254.) Relying on *E.piphany*, the court in *Burgett*, *supra*, 830 F.Supp.2d 953 similarly found that an insured was "potentially liable for disparagement by implication" when faced with a suit alleging it had made a false claim to be "the only owner" of a particular trademark. (*Id.* at p. 964.)

These cases suggest that the related requirements of derogation and specific reference may be satisfied by implication where the suit alleges that the insured's false or misleading statement necessarily refers to and derogates a competitor's product. A publication that claims a superior feature of a business or product as distinct from all competitors, such as a claim to be the "only" producer of a certain kind of software or the "only" owner of a trademark, may be found to clearly or necessarily disparage another party even without express mention. To find specific reference in these circumstances is consistent with limiting disparagement claims "to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." (*Blatty*, *supra*, 42 Cal.3d at p. 1044.)

The claim of disparagement recognized in *Charlotte Russe*, by contrast, appears to depart from the specificity requirements set forth above. There, an apparel manufacturer, People's Liberation, filed an action for fraud, breach of

16

contract, and restitution against a clothing store, Charlotte Russe, which it had enlisted to be the exclusive retailer of the brand. The complaint alleged that Charlotte Russe's heavy discounts on its premium apparel suggested to consumers that People's Liberation products were of inferior quality. The court rejected the insurer's contention that coverage was defeated because the underlying pleadings did not allege an " 'injurious false statement disparaging [the manufacturer's] products.' " (*Charlotte Russe*, *supra*, 207 Cal.App.4th at p. 979.) The court found sufficient the allegations that the People's Liberation brand was a premium good and that Charlotte Russe had "published prices" that implied they were not, thereby reasoning that the underlying complaint "pled that the implication carried by the Charlotte Russe parties' pricing was false." (*Ibid*.)

In the case before us, the Court of Appeal disagreed with *Charlotte Russe* as follows: "We fail to see how a reduction in price — even a steep reduction in price — constitutes disparagement. Sellers reduce prices because of competition from other sellers, surplus inventory, the necessity to reduce stock because of the loss of a lease, changing store location, or going out of business, and because of many other legitimate business reasons. Reducing the price of goods, without more, cannot constitute a disparagement; a price reduction is not 'an injurious falsehood directed at the organization or products, goods, or services of another . . . .' [Citation.]" (Fn. omitted.) We agree with this reasoning. There is no question that Charlotte Russe's discounted prices on People Liberation's clothing specifically referred to People Liberation's product. But a mere reduction of price may suggest any number of business motivations; it does not clearly indicate that the seller believes the product is of poor quality. Disparagement by "reasonable implication" (*Blatty*, *supra*, 42 Cal.3d at p. 1046; *Total Call*, *supra*, 181 Cal.App.4th at pp. 170–171) requires more than a statement that may conceivably or plausibly be construed as derogatory to a specific product or

17

business. A "reasonable implication" in this context means a clear or necessary inference. Charlotte Russe's prices did not carry an implication clear enough to derogate People Liberation's product for purposes of a disparagement claim. We disapprove *Charlotte Russe*, *supra*, 207 Cal.App.4th 969 to the extent it is inconsistent with this opinion.

### III.

We now consider whether the Court of Appeal was correct to conclude that the *Dahl* action did not allege disparagement within the meaning of the Hartford policy. In other words, did the facts and pleadings known or reasonably inferable by Hartford show a potential claim for express or implied disparagement? Ultimate appears to advance two separate theories of disparagement. The first focuses on Dahl's claim that the similarity of the Ulti-Cart's design and product name to the Multi-Cart's design and product name led consumers to confuse the Ulti-Cart with the Multi-Cart. The second contends that Ultimate's advertisements included false statements of superiority that implied the inferiority of the Multi-Cart. We address each theory in turn.

### A.

The Court of Appeal concluded that "[e]ven if the use of 'Ulti-Cart' could reasonably imply a reference to 'Multi-Cart,' . . . Ultimate's advertisement contained no disparagement of 'Multi-Cart.' " We conclude that the Court of Appeal was correct. Consumer confusion resulting from the similarity of the Ulti-Cart to the Multi-Cart may support a claim of patent or trademark infringement or unfair competition in certain circumstances, but it does not by itself support a claim of disparagement. Even if the Ulti-Cart was named and designed to mimic the Multi-Cart, that fact does not derogate or malign the Multi-Cart in any way.

There is no coverage for disparagement simply because one party tries to sell another's goods or products as its own. In *Aetna*, *supra*, 838 F.2d 346, for

18

example, the complaint alleged that the policyholder had engaged in unfair competition by advertising a competitor's animal tags as its own. (*Id.* at p. 349.) The Ninth Circuit concluded that the underlying action failed to allege any publication "which directly cast aspersions" on the underlying plaintiff's product or business. (*Id.* at p. 351, citing *Nichols*, *supra*, 169 Cal.App.3d at p. 774.) Thus, the court found no duty to defend against a claim of disparagement where the gravamen of the claim was that the policyholder had " 'palmed off' " the competitor's products as its own. (*Aetna*, at p. 351.)

Similarly, a party's attempt to copy or infringe on the intellectual property of another's product does not, without more, constitute disparagement. In *Homedics, Inc. v. Valley Forge Insurance Company* (9th Cir. 2003) 315 F.3d 1135, the Ninth Circuit considered whether a claim of patent infringement constituted disparagement triggering a duty to defend under California law. The underlying suit involved a claim by a company, Nikken, alleging that a competitor, Homedics, had infringed its patent on a therapeutic magnetic device used in alternative medical procedures. (*Id.* at p. 1137.) Finding no duty to defend, the court reasoned: "It does not follow that because an entity imitated the design of a product, it is, therefore, disparaging it. In point of fact, it's quite the opposite — as has been oft said: imitation is the highest form of flattery." (*Id.* at p. 1142.) *Homedics* also noted with approval the Court of Appeal's statement in *Maxconn, Inc. v. Truck Ins. Exchange* (1999) 74 Cal.App.4th 1267 that "[t]he absence of any express reference to patent infringement in the policy would lead a reasonable layperson to the conclusion that patent infringement is not covered." (*Id.* at p. 1276.)

Ultimate relies on *Michael Taylor Designs, Inc. v. Travelers Property Casualty Company of America* (N.D.Cal. 2011) 761 F.Supp.2d 904 (*Michael Taylor*), affd. (9th Cir. 2012) 495 Fed.Appx. 830, where the district court found a

19

duty to defend against a disparagement claim. There, a furniture designer, Rosequist, claimed that a furniture retailer, Michael Taylor Designs (MTD), distributed promotional materials that included photographs of Rosequist's high-quality furniture and then sold low-quality " 'cheap synthetic knockoffs' " in its showroom. (*Michael Taylor*, *supra*, 761 F.Supp.2d at p. 907.) This " 'bait-and-switch' " routine allegedly confused and misled consumers as to the origin of the furniture and diluted and tarnished Rosequist's trade dress. (*Ibid.*) The court observed that the allegation that customers would be "steered" to imitation products "fairly implies some *further* statements, presumably oral, were being made by MTD personnel to convey the information that the imitation products were the Rosequist furniture depicted in the brochures." (*Id.* at p. 912.) Under these circumstances, the court concluded that Rosequist had sufficiently alleged a claim of disparagement, triggering a duty to defend under the insurance policy held by MTD. (*Ibid.*)

Whatever the merits of *Michael Taylor*'s reasoning, the facts in this case do not include the kind of bait-and-switch tactics alleged in *Michael Taylor*. There is neither any specific allegation in the *Dahl* action nor any fact reasonably known to Hartford that clearly implies the inferiority of the Ulti-Cart to the Multi-Cart. It is true that Dahl, in a February 12, 2010 memorandum in support of a motion for a temporary restraining order, claimed that the Multi-Cart had become "widely recognized as an industry leading utility cart in the music performance industry" and that Ultimate was now marketing a "knock-off" of the Multi-Cart. Dahl also noted Ultimate's intent "to expand into [Dahl's] markets with similar pricing and with millions of dollars [*sic*] worth of Chinese carts planned to be dumped in the United States with lower pricing." However, in claiming patent and trademark infringement, Dahl repeatedly asserted that the two products were "nearly identical, folding transport carts." Indeed, Dahl's claims relied heavily on the fact

that the mark and design of the two products were nearly indistinguishable. A false or misleading statement that causes consumer confusion, but does not expressly assert or clearly imply the inferiority of the underlying plaintiff's product, does not constitute disparagement. Because the alleged likeness of the two products did not derogate the Multi-Cart, we reject Ultimate's theory of disparagement based on consumer confusion over the product name and design.

**B.**

Ultimate also contends that several phrases in its 2010 product catalog disparage the Multi-Cart by asserting the superiority of the Ulti-Cart. As Ultimate notes, the 2010 product catalog states that "Ultimate Support designs and builds innovative, superior products," that the company provides "unique support solutions that are crafted with unparalleled innovation and quality and accompanied by superior customer service," and that the Ulti-Cart has "patent-pending folding handles and levers." Ultimate suggests that these phrases imply that the Multi-Cart is inferior and that "patent-pending" suggests "that Dahl does not have proprietary rights to its product."

The Court of Appeal did not address these statements, instead noting that potential disparagement should be assessed by reference to the "allegations of the *Dahl* complaint, Dahl's application for a temporary restraining order, and Dahl's responses to interrogatories to the terms of the Hartford insurance policy." But, as discussed above, a duty to defend may be supported not only by the allegations in the complaint but also by facts alleged, reasonably inferable, or otherwise known to the insurer. Ultimate's new product catalog was produced by Dahl in the underlying action and referenced in his complaint. Thus, the contents of the catalog were reasonably known to Hartford and should be considered in determining whether the *Dahl* action set forth a possible claim of disparagement.

21

Even so, however, no disparagement claim is apparent. Ultimate contends that the phrase "patent-pending" when combined with words like "innovative," "unique," "superior," and "unparalleled" suggests the superiority of the Ulti-Cart and, by implication, the inferiority of the Multi-Cart. But these words considered in their context do not support Ultimate's contention. Although the phrase "patent-pending folding handles and levers" appears on the page of the catalog describing the Ulti-Cart, the words "innovative," "unique," "superior," and "unparalleled" appear on pages providing general descriptions of the company, and they are most reasonably understood as generic assertions of the company's excellence. For example, "superior" does not necessarily imply a derogatory comparison; it may be used to describe something "[o]f great value or excellence; extraordinary" (American Heritage Dict. (4th ed. 2000) p. 1737) or "notably excellent of its kind: surpassingly good" (Webster's 3d New Internat. Dict. (2002) p. 2294). Similarly, "patent-pending" does not guarantee that a patent will be granted or that the product is of higher quality. Contrary to Ultimate's claims, these statements are not specific enough to call into question Dahl's proprietary rights in his product or to suggest that the Ulti-Cart has any unique feature that is an " 'important differentiator' between competing products." (*E.piphany*, *supra*, 590 F.Supp.2d at p. 1253.) Rather, the phrases at issue appear to be more "akin to 'mere puffing,' which under long-standing law cannot support liability in tort." (*Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1361, fn. 3.)

Were we to adopt Ultimate's theory of disparagement, almost any advertisement extolling the superior quality of a company or its products would be fodder for litigation. Proliferation of such litigation would interfere with "the free flow of commercial information" (*Va. Pharmacy Board v. Va. Consumer Council* (1976) 425 U.S. 748, 765) and "the informational function of advertising"

22

(*Central Hudson*, *supra*, 447 U.S. at p. 563), which are essential to informed choice in our free enterprise economy.  In light of the important purposes of commercial speech, specificity requirements serve to narrow the range of publications in the marketplace that may rise to the level of a legally actionable injurious falsehood.

## CONCLUSION

Our holding clarifies and limits the scope of an insurer's duty to defend a policyholder against a possible claim of disparagement, as that term is used in a commercial general liability policy.  Of course, an insurer and its insured may contract for any broader coverage to which they mutually agree.  Here, because the facts and pleadings were not sufficient to support a possible claim of disparagement, there was no duty to defend under the Hartford policy.  We affirm the judgment of the Court of Appeal.

LIU, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
KENNARD, J.*

_____
* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Hartford Casualty Insurance Company v. Swift Distribution, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 210 Cal.App.4th 915
**Rehearing Granted**

_____

**Opinion No.** S207172
**Date Filed:** June 12, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Debre Katz Weintraub

_____

**Counsel:**

Little Reid & Karzai, Eric R. Little, M. Catherine Reid and Najwa Tarzi Karzai for Defendants and Appellants.

Amy Bach; Dickstein Shapiro, Kirk A. Pasich and Kimberly A. Umanoff for United Policyholders as Amicus Curiae on behalf of Defendants and Appellants.

Nossaman, Kurt W. Melchior and S. Ashar Ahmed for Bullpen Distribution, Inc., and Jon Brill as Amici Curiae on behalf of Defendants and Appellants.

Caldwell Leslie & Proctor, Christopher G. Caldwell, Andrew Esbenshade and Kelly L. Perigoe for Charlotte Russe Holding, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

Gauntlett & Associates and David A. Gauntlett as Amici Curiae on behalf of Defendants and Appellants.

Steven W. Murray as Amicus Curiae on behalf of Defendants and Appellants.

Dentons US, Michael Barnes; Tressler, David Simantob, Elizabeth L. Musser; Akin Gump Strauss Hauer & Feld and Rex S. Heinke for Plaintiff and Respondent.

McCurdy & Fuller, Laura J. Ruettgers and David C. Hungerford for Ironshore Specialty Insurance Company as Amicus Curiae on behalf of Plaintiff and Respondent.

Wiley Rein, Laura A. Foggan, Edward R. Brown; Sinnott, Puebla, Campagne & Curet and Randolph P. Sinnott for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Kutak Rock, Christopher D. Glos, Bradley J. Baumgart and Jean-Paul Assouad for American Guarantee & Liability Insurance Company as Amicus Curiae on behalf of Plaintiff and Respondent.

Horvitz & Levy, Peter Abrahams and Mitchell C. Tilner for American Insurance Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric R. Little
Little Reid & Karzai
3333 Michelson Drive, Suite 310
Irvine, CA  92612
(949) 333-1699

Rex S. Heinke
Akin Gump Strauss Hauer & Feld
2029 Century Park East, Suite 2400
Los Angeles, CA  90067
(310) 229-1030