Filed 11/19/14  1st American Warehouse Mortgage v. Topa Ins. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| 1st AMERICAN WAREHOUSE MORTGAGE, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> TOPA INSURANCE COMPANY, <br><br> Defendant and Respondent. | B251972 <br><br> (Los Angeles County <br> Super. Ct. No. BC451031) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ralph Dau, Judge.  Affirmed.

Burke Molina, Gregory Burke for Plaintiff and Appellant.

Selman Breitman, Alan B. Yuter and Andrew T. Chan for Defendant and Respondent.

Plaintiff, 1st American Warehouse Mortgage, Inc., doing business as Real Estate Specialists (1st American), appeals from a summary judgment entered in favor of defendant, Topa Insurance Company (Topa), on a complaint for bad faith breach of insurance contract and breach of the implied covenant of good faith and fair dealing. The dispute giving rise to this insurance coverage action is based on a real estate purchase by John Cantu (Cantu) and Michael Thomas (Thomas) as part of a joint venture. Cantu sued Thomas, alleging that Thomas had misappropriated funds and had misrepresented that he was a real estate agent during the purchase of and subsequent attempts to rent and sell the property. After obtaining a default judgment against Thomas, Cantu separately sued 1st American, alleging that Thomas was 1st American's agent and that 1st American failed to supervise Thomas or ensure that Thomas did not make misrepresentations regarding his relationship with 1st American or the status of his real estate license. Cantu also alleged that 1st American had a dual agency relationship with respect to the purchase of the property that it failed to disclose. 1st American tendered the second lawsuit for defense to its insurer, Topa. Topa denied the claim, leading to the instant action. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

**The Joint Venture Litigation (The *Thomas* Complaint)**

In October 2005, Cantu and Thomas entered into an agreement to purchase real property located at 1695 Adrienne Street in Corona (the property) as part of a joint venture. Cantu and Thomas agreed to purchase, fix up and flip the house for a quick profit. As part of the joint venture, Thomas and Cantu agreed that Cantu would initially be the sole purchaser of the property. Thomas was to be added to the title once escrow closed because he was not able to qualify for a loan. The two agreed to be equally responsible for paying the necessary expenses, mortgage payments, and repair and renovation costs. Thomas indicated that he would handle the sale because he was a licensed real estate agent.

2

On November 16, 2005, Cantu executed a purchase agreement for the property, which listed 1st American as Cantu's broker. The purchase agreement was signed by Robert Castaneda (Castaneda) on behalf of 1st American. The seller was represented by an unrelated party, ERA North Orange County Real Estate. Escrow closed on the purchase of the property on December 30, 2005.

1st American and Topa disagree as to when Thomas's name was placed on a grant deed to the property. Topa claims that Cantu had a grant deed prepared which placed Thomas's name on the title on January 17, 2006 (the same date alleged by Cantu in his complaint against Thomas). 1st American asserts that Cantu executed the grant deed on March 8, 2006, and it was recorded on April 6, 2006.

On December 19, 2006, Cantu filed an action entitled *Cantu v. Thomas*, Riverside County Superior Court, Case No. RIC462592 (the *Thomas* complaint). The *Thomas* complaint alleged that Thomas "represented" to Cantu that Thomas was "a real estate agent/expert/specialist." It further alleged that Thomas failed to make necessary financial contributions towards the joint venture, including mortgage payments and money owed for maintenance, repair and renovation costs. In March and April 2006, Thomas misappropriated funds from the joint venture's bank account.

The *Thomas* complaint further alleged that on or around May 31, 2006, Cantu learned that Thomas was not a licensed real estate agent. Cantu realized that Thomas had only made the representations "to induce and entice [Cantu] to put [Thomas's] name on the deed." Cantu then confronted Thomas, who claimed he would "handle it" and would be listing the property for sale. Cantu objected to Thomas's further involvement with the property because Thomas had failed to perform obligations under their joint venture.

Cantu alleged that, without Cantu's knowledge or consent, Thomas then listed the property for sale with his neighbor "Lisa" at Touchdown Realty and also attempted to sell the property by using the identity of a former 1st American employee, Paul Hershman (Hershman), without Hershman's or 1st American's permission. Thomas then rented the property without Cantu's consent.

3

Based on this complaint, Cantu obtained a default judgment against Thomas for $207,156.76 in May 2008.

**The Complaint against 1st American (The *Castaneda* Complaint)**

On September 3, 2008, Cantu sued 1st American and its two owners, Castaneda and Raj Champaneri, in an action entitled *Cantu v. Castaneda, et al.*, Riverside County Superior Court, Case No. RIC507426 (the *Castaneda* complaint). The *Castaneda* complaint, which contained causes of action for negligence, breach of fiduciary duty and negligent misrepresentation, made the following allegations: Thomas held himself "out as a real estate agent/expert/specialist, and alleged partner pursuant to the implied joint venture agreement . . . and based thereon became a named owner [of] the real property" at issue. Thomas "worked for, was the agent of, and employee" of 1st American.[1] In October 2005, Cantu contacted Thomas, who was a high school friend. Thomas advised Cantu that Thomas was making good money buying and selling houses. Cantu and Thomas discussed the possibility of entering into their joint real estate venture. Thomas indicated that he would handle the purchase and sale of any property because he was a licensed real estate agent.

Thomas showed Cantu the property, which was listed on 1st American's Multiple Listing Service. Thomas handled the purchase, which took place on or about November 16, 2005. As a result of Thomas's actions, Cantu sued Thomas and obtained a judgment against him.

The *Castaneda* complaint asserted that 1st American was directly liable to Cantu with respect to Cantu's 2005 purchase of the property based on 1st American's failure to disclose (1) that it had a dual agency relationship and (2) that Castaneda was not a broker (as represented on the contract for 1st American). Cantu also contended in the *Castaneda* complaint that 1st American was liable as Thomas's employer for Thomas's conduct in the joint venture under the doctrine of respondeat superior. The *Castaneda* complaint further alleged: "[1st American] owed a duty to [Cantu] and to all other persons, whether

---

[1] It is undisputed that, in fact, Thomas was never an employee of 1st American.

4

actual clients or other business partners, [who] use or hire Thomas, to make sure that Thomas did not misrepresent his actual capacity with [1st American] or that he fully disclosed to those clients, friends or other persons he worked on any deals, that his license was in suspension by the Department of Real Estate. In fact, [1st American] owed a duty to place Thomas on a leave of absence or take over all Thomas's pending deals to ensure that the honesty, loyalty, integrity and client/broker relationship was not impaired." Thus, 1st American allegedly was negligent in "failing to properly supervise Thomas and allowing Thomas to make a real estate deal on a suspended license" without advising Cantu that Thomas was having problems with the Department of Real Estate.

The *Castaneda* complaint initially alleged that Cantu was unaware of Thomas's affiliation with 1st American until after he purchased the property. (See Complaint at ¶¶ 9, 11.) However, Paragraph 18 of the *Castaneda* complaint then inconsistently alleged: "Plaintiff would never have enter [*sic*] a joint venture agreement to purchase the subject property and sale, and to place [Thomas's] name thereon, but for [Thomas's] representation of being a qualified and licensed real estate agent working under [1st American]." Paragraph 24 of the *Castaneda* complaint similarly alleged that Cantu "would never have got [*sic*] involved with Thomas, except for the fact of [Thomas's] representation of being a current licensed Real Estate agent/specialist working under [1st American's] company and license." Cantu alleged that he never would have entered into the joint venture with Thomas, purchased the property, placed Thomas's name on the property or recorded the deed but for Thomas's representations. Notably, the *Castaneda* complaint does not contain the allegations that were included in the *Thomas* complaint about Thomas's post-purchase conduct, including that Thomas attempted to sell the property or that Thomas rented out the property in November 2006.

The Riverside County Superior Court dismissed the *Castaneda* complaint for failure to prosecute on October 24, 2011.

5

**The Insurance Policy**

Topa issued a Real Estate Agents and Brokers Errors and Omissions Insurance policy to 1st American, policy number 2005788-02, with a policy period of March 1, 2008, through March 1, 2009. The policy had a "Prior Acts Date" of March 1, 2006.

The policy provides coverage as follows: "The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured and reported to the Company during the Policy period, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by an Insured covered under this policy. Provided always that such negligent act, error, omission or Personal Injury happens: [¶] (a) During the Policy Period; or [¶] (b) Prior to the Policy Period provided that: (1) Such negligent act, error, omission or Personal Injury happened on or after the Prior Acts date as indicated in the Declarations, and (2) The Insured did not know and could not have reasonably expected a Claim would be made against an Insured prior to the effective date of such coverage. [¶] The Company shall have the right and duty to defend any suit against the Insured seeking Damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent."

The policy defines a "Claim" as "a demand for money or services, or the filing of suit or institution of arbitration or mediation proceedings naming the Insured and alleging a negligent act, error, omission or Personal Injury resulting from the rendering of or failure to render Professional Services."

"Professional Services" is defined as "services performed by the Insured in the Insured's capacity as a licensed broker, buyer's broker, agent, appraiser of real estate, a real estate consultant, counselor or property manager, pursuant to the Business and Professions Code or any other statutory authority which requires such professional services to be licensed, certified or bonded. It includes incidental services rendered by any insured as a notary public, title agent or as a member of a formal accreditation, standards review or similar board or committee. Unlicensed employees of an insured

6

licensed agent or broker are covered when acting on behalf of the insured licensed agent or broker."

An "'Insured' means any person or organization qualifying as an insured in the 'Persons Insured' provision of this policy." An Insured under the policy is defined as "any current or former executive officer, director or stockholder, employee, Salesperson or licensed real estate agent thereof of the Named Insured but only while acting on behalf of the Named Insured and within the scope of their duties as such."

Paragraph V of the policy excludes from coverage and defense certain claims. The policy states: "This insurance does not apply to, and the Company will not defend or pay for, Claims: [¶] . . . . [¶] E. Based on or arising out of the rendering of or failure to render Professional Services by any Insured as an employee, owner, partner, stockholder, director or officer of any sole proprietorship, partnership or corporation or other business enterprise not listed in the Declarations. [¶] . . . . [¶] J. Based on or arising out of Professional Services of the insured involving property syndication, real estate investment trusts, limited or general partnerships, including but not limited to corporate entities, or ventures when any such Claim is brought by or on behalf of an investor, shareholder or partner in any such entity."

**The Tender of The Defense to Topa**

Superior Claims Services (Superior) is Topa's claims adjustor. On January 23, 2009, 1st American tendered the *Castaneda* complaint to Superior for defense and indemnity in an email sent by Castaneda. Castaneda's email stated that he, Cantu and Thomas knew each other from high school. Castaneda described the business relationship between Cantu and Thomas and stated that he (Castaneda) had represented Cantu in the purchase of the property. Castaneda stated he personally met with Cantu "on different occasions to sign documents and disclosures" related to the purchase of the property. At the close of escrow, pursuant to directions from Cantu and Thomas, Castaneda "gave [T]homas a rebate on the commission since [there was approx] $7000 that he was to split with Cantu as they were partners." [*sic*] Castaneda indicated that, after

7

the *Thomas* litigation ended, Cantu notified the Department of Real Estate, which audited Castaneda because of the rebate check Thomas received.

Castaneda's January 23, 2009, email further stated that Thomas's name was added to the property 17 days after escrow was closed (i.e., in January 2006) and thereafter the partnership "went south." According to Castaneda, Cantu and Thomas ultimately lost the property in foreclosure due to the declining housing market. Castaneda also pointed out the inconsistent allegations Cantu made in the *Castaneda* complaint regarding when Cantu became aware of 1st American's involvement in the real estate deal.

The claim was reviewed and investigated by Peter Fitzgerald (Fitzgerald), a claims representative employed by Superior. The parties dispute whether Fitzgerald was aware of the *Thomas* complaint and judgment when Topa denied coverage and a defense. The parties also dispute whether Fitzgerald mishandled the investigation because he failed to make obvious inquiries or contact relevant witnesses prior to the denial of coverage. 1st American also found fault with the investigation because Superior did not have a claims manual.

On February 12, 2009, Greg Johnson, the President of Superior, recommended that Topa deny the claim. The recommendation noted that Cantu and a third party entered into a partnership to purchase the subject property and that 1st American acted as an agent in the transaction. Escrow for the purchase of the property closed on December 30, 2005, well before the Prior Acts Date of March 1, 2006.

Topa denied the tender of defense and indemnity for the claim in an April 7, 2009, letter, explaining that the denial was based on the December 30, 2005, closing date, which preceded the March 1, 2006, Prior Acts Date. The letter also notes that it was not intended to be an exhaustive list of all grounds for denying coverage and defense nor was it intended to be a waiver of any of Topa's rights.

On October 27, 2010, counsel for 1st American sent a letter to Topa. Among other things, counsel argued that Topa did not fully review allegations in the *Castaneda* complaint before denying coverage. Counsel's letter also cited the *Thomas* complaint

8

and argued that the claims were covered due to allegations in that action.  In response, Topa confirmed its denial of coverage.

**The Insurance Litigation (*1st American v. Topa*)**

After Topa denied coverage, 1st American filed the current action against Topa for bad faith and breach of the implied covenant of good faith and fair dealing on December 12, 2010.  The complaint requested compensatory and punitive damages.[2]

On August 14, 2012, Topa filed a summary judgment motion.  Topa argued it was entitled to summary judgment on the bad faith and breach of the implied covenant causes of action because the policy did not provide coverage for the liability claim.  Topa further asserted 1st American could not prevail on the breach of implied covenant cause of action and request for punitive damages because Topa reasonably handled the claim.

The bulk of 1st American's disputed facts submitted in opposition to summary judgment pointed to allegations in the *Thomas* complaint that, after March 1, 2006, Thomas rented the property to third parties and attempted to sell the property, while continuing to hold himself out to Cantu and others as a licensed agent.[3]  1st American

---

[2]    The caption page of 1st American's complaint requested restitution and injunctive relief.  However, there are no allegations in the complaint to support these requests.

[3]    1st American filed the declaration of its counsel (Burke Declaration) as purported evidence in support of its opposition to summary judgment.  Topa filed 29 objections to that declaration, all but two of which were sustained by the trial court on various grounds.  1st American now claims those rulings were erroneous.  The portions of the Burke Declaration at issue contained lengthy summaries and quotations from documents, including deposition transcripts, pleadings, and the underlying insurance policy.  Topa therefore appropriately raised, and the trial court properly sustained, objections that these statements by 1st American's counsel contained inadmissible hearsay and improper opinion testimony, lacked personal knowledge, and attempted to prove the contents of a writing through oral testimony, in violation of Evidence Code sections 1200, 800, 702(a), and 1523, respectively.  However, the exclusion of these paragraphs of the Burke Declaration does little to alter our analysis, as the pertinent underlying documents (e.g., deposition testimony, the insurance policy) were not objected to, were in large part

contended that the *Thomas* complaint also alleged that Thomas told Cantu he was employed by 1st American, but that allegation is not contained in the *Thomas* complaint. The *Castaneda* complaint, on the other hand, *does* allege that Thomas represented to Cantu that he worked for 1st American, but does not contain any allegations regarding Thomas's post-March 2006 conduct in attempting to sell or rent the property.

On August 8, 2013, the trial court determined, among other things, that summary judgment was appropriate because all of the allegations in the *Castaneda* complaint concerning "Professional Services" as defined in the policy occurred before the Prior Acts Date. In addition, because there was no coverage, there was no basis to impose liability for a breach of the implied covenant of good faith and fair dealing or for punitive damages. The trial court entered an order granting the summary judgment. This timely appeal followed.

## DISCUSSION

### I. Standard of Review for Summary Judgment

A defendant is entitled to a summary judgment "only if 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.]" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.) "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence

---

submitted by Topa as evidence, and were relied upon by the parties and by the court during the summary judgment proceedings.

would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . [¶] . . . [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850–851, fns. omitted.) An appellate court independently reviews the record to determine whether triable issues of material fact exist. (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606.) The evidence is reviewed in a light most favorable to the losing party and ambiguities and evidentiary disputes are resolved in the losing party's favor. (*Martinez v. Combs*, *supra*, at p. 68.)

## II.  Insurance Standards

"An insurer's duty to indemnify and its duty to defend an insured 'lie at the core of the standard policy.' [Citation.]" (*Hartford Cas. Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286-287 (*Hartford*).) The insurer has a broad duty to defend third party claims against its insured. (*Id.* at p. 287; *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 (*Montrose*).) Although the duty to defend is broad, it is not "unlimited; it is measured by the nature and kinds of risks covered by the policy." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 (*Waller*).) "'Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured, or because the actual judgment is for damages not covered under the policy.' [Citation.]" (*Hartford,*

11

*supra*, 59 Cal.4th at p. 287.)  The duty to defend may exist in an action where coverage is in doubt but does not ultimately develop.  (*Montrose*, *supra*, 6 Cal.4th at p. 295.)

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy."  (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081; accord *Montrose supra*, 6 Cal.4th at p. 295.)  The duty to defend is relieved only if the complaint raises no conceivable theory by which the coverage would exist under the policy.  (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276, fn. 15 (*Gray*).)  "An insurer must defend against a suit even '"where the evidence suggests, but does not conclusively establish, that the loss is not covered."'  [Citation.]"  (*Hartford*, *supra*, 59 Cal.4th at p. 287.)  "This includes all facts, both disputed and undisputed, that the insurer knows or '"becomes aware of"' from any source [citation] 'if not "at the inception of the third party lawsuit," then "at the time of tender."'  [Citation.]  'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.'  [Citation.]  Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.'  [Citation.]  In general, doubt as to whether an insurer owes a duty to defend 'must be resolved in favor of the insured.'  [Citation.]"  (*Ibid*.)

The issue of whether the third party complaint triggers an insurer's duty to defend requires an interpretation of the insurance policy.  (*Barnett v. Fireman's Fund Insurance Co.* (2001) 90 Cal.App.4th 500, 508.)  Because an insurance policy is a contract, ordinary rules of contract interpretation apply to language in an insurance policy.  (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115; *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868.)  The court gives effect to the parties' mutual intentions at the time of contracting.  (Civ. Code, § 1636; *State of California v.*

12

*Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1018.)  Unless the parties have used the words in a technical sense or with a special meaning, the words of the insurance policy are interpreted in an ordinary and popular sense.  (Civ. Code, § 1644; *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204.)  To protect the insured's reasonable expectation of coverage, uncertainty and ambiguity are resolved in favor of the insured. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470; *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763.)  The interpretation of an insurance policy is a question of law (*Hartford*, *supra*, 59 Cal.4th at p. 288) including "[w]hether a third party action asserts a potentially covered claim under the policy triggering the duty to defend." (*Barnett*, *supra*, at p. 508.)  We independently review an insurance policy for the proper construction.  (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2013) 217 Cal.App.4th 62, 69 (*Liberty*).)

### III.  The Absence of Triable Issues of Material Fact

1st American claims that Topa's duty to defend was triggered by allegations in the *Castaneda* complaint as well as extrinsic evidence which raised the *possibility* of coverage.  As previously noted, an insurer has the duty "to defend a suit "which *potentially* seeks damages within the coverage of the policy."  (*Gray*, *supra*, 65 Cal.2d at p. 275.)  Resolution of the question of duty to defend is normally made "in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Waller, supra*, 11 Cal.4th at p. 19.)

The policy here covers "claims" which arise "out of any negligent act, error, omission . . . in the rendering of or failure to render" professional services by an insured for claims made during the policy period.  The policy has a Prior Acts Date of March 1, 2006, and does not provide coverage for "any negligent act, error, omission" which occurred prior to that date.

It was not disputed that 1st American represented Cantu in the purchase of the property and that escrow closed on December 30, 2005.  The *Castaneda* complaint, while hardly a model of clarity, alleges 1st American directly provided "professional services"

13

to Cantu in connection with that purchase and that, with respect to those services, 1st American failed to disclose its dual agency and that Castaneda was not a broker as he had claimed. But these services were provided by 1st American prior to the policy's Prior Acts Date of March 1, 2006 and there are no allegations that 1st American provided any direct professional services to Cantu after December 30, 2005. Thus, to the extent the *Castaneda* complaint seeks liability stemming from 1st American's provision of direct services, those claims fall outside the provisions of the policy. (*Hartford*, *supra*, 59 Cal.4th at p. 287.)

But the gravamen of the *Castaneda* complaint (as relevant to potential insurance coverage) is the claim that 1st American is liable to Cantu for its agent Thomas's conduct based on two theories: (1) 1st American is vicariously liable for the tortious conduct of its alleged employee (Thomas) under the doctrine of respondeat superior; and (2) even if Thomas was not its employee, 1st American had a duty to prevent and/or warn of Thomas's continuing misrepresentations and misdeeds after the March 1, 2006, Prior Acts Date, and is liable to Cantu for breaching that duty. As detailed below, neither of these theories establishes that Topa had a duty to defend.

With respect to the first theory, we find 1st American cannot be held vicariously liable for Thomas's conduct where Thomas was never its employee. Although the *Castaneda* complaint contains allegations to the contrary, the undisputed extrinsic evidence establishes that Thomas was never employed by 1st American and Topa was entitled to rely on those facts in denying coverage. "Facts extrinsic to the complaint give rise to a duty to defend when they reveal a potential for coverage, though conversely, when extrinsic facts eliminate that potential, an insurer may decline to defend." (*Liberty, supra*, 217 Cal.App.4th at p. 76, citing *Waller*, *supra*, 11 Cal.4th at p. 19.) Thus, while the duty to defend is broad, it does not encompass a circumstance where, as here, extrinsic evidence "conclusively establish[es]" a lack of coverage. (*Hartford*, *supra*, 59 Cal.4th at p.287.) The policy expressly covers only "professional services" performed by

14

the insured or its employees. Because he was never an employee, none of Thomas's conduct would trigger coverage.

Second, even if Thomas had been an employee, the policy would not have covered the conduct that Cantu alleges Thomas committed. Cantu alleged that he never would have entered into the joint venture with Thomas, purchased the property, placed Thomas's name on the deed, or recorded the deed absent Thomas's representations. All of Thomas's representations leading to the joint venture's purchase of the property would by necessity have occurred before escrow closed on December 30, 2005. And, although 1st American claims that Cantu placed Thomas's name on the grant deed and recorded the deed to the joint venture's property after the Prior Acts Date of March 1, 2006, that conduct can by no means be construed as "professional services" by either Thomas or 1st American as that term is defined in the policy.

Third, we disagree with 1st American's argument that Topa had a duty to defend based upon Thomas's alleged wrongful conduct in listing, renting, and attempting to sell the property after the March 1, 2006, Prior Acts Date. To begin with, the *Castaneda* complaint tendered to the insurer does not allege that Thomas did *anything* wrong after the property was purchased on December 30, 2005. The allegations that Thomas listed, rented, and attempted to sell the property in 2006 are contained only in the *Thomas* complaint, not the *Castaneda* complaint. Nor does the *Castaneda* complaint specifically incorporate the *Thomas* complaint (referencing only the court and case number as part of the background discussion of facts), contrary to what 1st American claims.

Beyond those issues, the allegations of both complaints and extrinsic evidence establish that Thomas's alleged post-March 2006 conduct was undertaken as part of the joint venture with Cantu. Topa is correct that this fact triggered the exclusion from coverage and defense in paragraph V of the policy for lawsuits against any insured by a business partner. The policy states: "This insurance does not apply to and the Company will not defend or pay for, Claims: [¶] . . . . [¶] E. Based on or arising out of the rendering of or failure to render Professional Services by any Insured as an employee,

15

owner, partner, stockholder, director or officer of any sole proprietorship, partnership or corporation or other business enterprise not listed in the Declarations. [¶] . . . . [¶] J. Based on or arising out of Professional Services of the involving property syndication, real estate investment trusts, limited or general partnerships, including but not limited to corporate entities, or ventures when any such Claim is brought by or on behalf of an investor, shareholder or partner in any such entity." Thus, because the *Castaneda* complaint arose out of Thomas's alleged rendering or failure to render professional services in his capacity as a partner in a joint venture business enterprise, it triggered the policy exclusion.

1st American's second theory is that its *own* alleged conduct as implicated in the *Castaneda* complaint should have given rise to a duty to defend. According to 1st American, Cantu's allegations that 1st American "failed to properly supervise [Thomas] in connection with the continued misrepresentations and attempted sale of the subject property are [a] covered event occurring after the prior acts date." However, as noted above, the *Castaneda* complaint does not contain any allegations of wrongdoing after the close of escrow in December 2005. Thus, any failures by 1st American alleged therein would fall outside of the policy coverage period.

In an attempt to avoid the Prior Acts Date exclusion, 1st American again points to the *Thomas* complaint's allegations of post-March 2006 conduct, arguing that Cantu's claims are premised on 1st American's failure to supervise Thomas (and Thomas's resulting misconduct) in 2006. Even if we could consider the *Thomas* complaint as properly incorporated into (or as extrinsic evidence in support of) the *Castaneda* complaint, those allegations cannot save 1st American here. Crucially, Cantu's allegations in the *Thomas* complaint admit that he knew as of May 31, 2006, that Thomas was not a licensed real estate agent and that, *after* that discovery, Thomas began his attempts to list, rent and sell the property. As such, Cantu cannot establish that he was continuing to rely on Thomas's misrepresentations at that time. Correspondingly, Cantu

16

cannot establish that 1st American's alleged failure to inform him Thomas was not licensed and/or failure to keep Thomas from misbehaving caused Cantu any damage.[4]

For the aforementioned reasons, Topa established it was entitled to summary adjudication of the bad faith breach of insurance contract cause of action. "[W]hen there is no potential for coverage, a cause of action for bad faith in the investigation and processing of a claim will not lie." (*R&B Auto Center, Inc v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 353.)

Furthermore, because there was no coverage under the policy for the *Castaneda* complaint, 1st American cannot prevail on its claim for breach of the implied covenant for mishandling the investigation and for punitive damages. "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." (*Waller, supra,* 11 Cal.4th at p. 36.) Topa did not breach the implied covenant of good faith and fair dealing because it was under no obligation to defend or indemnify the *Castaneda* complaint.

## DISPOSITION

The judgment is affirmed. Topa Insurance Company is awarded its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

---

[4] The allegation that Cantu also relied on Thomas's representation that he was working for 1st American does not change this analysis. First, once Cantu knew Thomas was not licensed, Cantu could not reasonably depend on any statement that Thomas was working on behalf of 1st American. Second, Cantu never alleged in the *Thomas* complaint that Thomas told Cantu he was working for 1st American or that Cantu relied on that fact. Instead, the *Thomas* complaint alleges only that, while attempting to list the property in 2006, Thomas held himself out as Paul Hershman, a former 1st American agent, without the permission of Hershman or 1st American, and without Cantu's "consent or knowledge." This reference is the only mention of 1st American in the *Thomas* complaint.

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.