Filed 1/11/24  Switzer v. Big Ticket Pictures CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KAYE SWITZER et al., | B320513 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC690564) |
| v. | |
| BIG TICKET PICTURES INC. et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on December 21, 2023, be modified as follows:

1.  On page 5, in the first sentence of the paragraph that

begins, "In February 2015," delete the phrase "—which by that time was a subsidiary of CBS Studios Inc. (CBS)—" so the full sentence reads as follows:

> In February 2015, Big Ticket and Sheindlin—who by that time was negotiating through a company called Her Honor Inc. (Her Honor)—signed a further amendment to the 1996 Agreement (the 2015 Agreement).

2. On page 7, in the second sentence of the last paragraph on that page that begins with "On January 19, 2018," add the phrase "Studios Inc. (CBS)" following "CBS", so the phrase reads as follows:  "CBS Studios Inc. (CBS)".

3. On pages 7 to 8, delete the language in footnote 2 and replace the language with the following so the full footnote reads as follows:

> [2]     Plaintiffs assert in their briefing and in their petition for rehearing that the trial court "incorrectly meld[ed]" various CBS-affiliated entities involved in the Library transactions, that this court made unauthorized "factual findings" in looking at the evidence on summary judgment regarding which CBS-affiliated entities were parent entities of Big Ticket, and that the ambiguity regarding corporate ownership precludes summary judgment.  The trial court's treatment of the corporate structure is irrelevant in light of our de novo review of summary judgment; our examination of the evidence itself for triable issues of material fact is appropriate (as we are not bound to accept allegations in plaintiffs'

separate statement contradicted by that evidence); and any disputes over who owns Big Ticket is immaterial because what matters to the resolution of plaintiffs' claims is the *terms* of the sale, not which corporation owns one of the parties to that sale (as Big Ticket was indisputably the party to each of the pertinent contracts).

4. On page 8, in the last sentence of the paragraph at the top of the page, delete the phrase "CBS subsidiary" and replace it with the phrase "then-affiliated with CBS" so the full sentence reads as follows:

> Plaintiffs sought a lump sum payment of at least $4.95 million on the theory that the Library was sold twice (first from Big Ticket to Sheindlin, and then from Sheindlin to Big Ticket as then-affiliated with CBS), and the second sale triggered their right to a lump sum cash-out payment.

5. On page 9, in line 14, delete the phrase "a subsidiary of CBS" and replace it with the phrase "then-affiliated with CBS".

6. On page 11, in footnote 3, add a sentence to the end of the footnote as follows:

> In a similar vein, because we are merely *assuming* the Library was sold twice, we reject plaintiffs' argument in their petition for rehearing that we have somehow engaged in impermissible factfinding by *finding* that the sales occurred.

7. On page 12, after the sentence that concludes in line 15, add as footnote 4 the following footnote, which will require renumbering of all subsequent footnotes:

> 4    In their petition for rehearing, plaintiffs assert that we may not look to the August 4, 2017 Agreement because the trial court assumed that two sales of the Library occurred; according to plaintiffs, the August 4, 2017 Agreement is verboten because it was designed to undo any sale. We reject this assertion. Like the trial court, we are assuming two sales occurred. And we are examining the August 4, 2017 Agreement to ascertain the identity of the buyer in the second of the two sales. We see no inconsistency in doing so.

8. On page 14, in the second sentence of what was previously numbered as footnote 4, delete the phrase "it is nowhere in the operative complaint" and replace it with the phrase "contrary to the assertion in their petition for rehearing, this theory is nowhere alleged as a breach in the operative complaint" so the full sentence reads as follows:

> Plaintiffs have waived this newly minted theory by raising it for the first time during rebuttal at oral argument on appeal; contrary to the assertion in their petition for rehearing, this theory is nowhere alleged as a breach in the operative complaint, and cannot be used to evade summary judgment (which, by definition, is framed by the operative pleadings).

4

9. On page 17, in what was previously numbered as footnote 6, add the following sentences to the end of the footnote:

> In their petition for rehearing, plaintiffs assert that they are entitled to rehearing because they were not given sufficient opportunity to brief this issue. They are wrong. Plaintiffs explicitly raised this issue in their opening brief on appeal, but elected to give the issue short shrift; in other words, plaintiffs had the opportunity to brief the issue more fully but opted not to take it. Their tactical choice does not entitle them to rehearing.

\* \* \*

There is no change in the judgment.

Appellants' petition for rehearing is denied.

_____

LUI, P. J.        CHAVEZ, J.        HOFFSTADT, J.

Filed 12/21/23  Switzer v. Big Ticket Pictures CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KAYE SWITZER et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>BIG TICKET PICTURES INC. et al.,<br><br>  Defendants and Respondents. | B320513<br><br>(Los Angeles County Super. Ct. No. BC690564) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kristin S. Escalante, Judge.  Affirmed.

Cozen O'Connor, Erik L. Jackson, Thomas W. Casparian; Chesnoff & Schonfeld and Richard A. Schonfeld for Plaintiffs and Appellants.

Loeb & Loeb, James A. Curry and Daniel J. Friedman for Defendants and Respondents.

* * * * * *

In this contract dispute, developers on the first season of the *Judge Judy* television show sued on the ground that a recent sale of the library of episodes triggered their right to a lump sum cash-out payment of $4.95 million (rather than continuing to receive an income stream of residuals).  On summary judgment, the trial court assumed that there was a sale of the library but ruled that the undisputed facts did not establish that the developers were contractually entitled to a cash-out.  This was correct, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

#### A.    *The* **Judge Judy** *show*

Big Ticket Pictures Inc. (Big Ticket) produced the *Judge Judy* television show since its inception in 1995.  Kaye Switzer (Switzer) and Sandi Spreckman (Spreckman) helped develop the show,[1] which aired for 25 seasons.  Judith Sheindlin (Sheindlin) is the titular "Judge Judy."

#### B.    *Rights of developers to share the show's residuals*

##### 1.    *1995 Agreement*

In August 1995, Big Ticket entered into a contract with Switzer and Spreckman to compensate them for their role in developing the *Judge Judy* show.  Big Ticket agreed to pay them

---

[1]    Doug Llewelyn was a third developer, but is not a party to this lawsuit and is therefore not mentioned further.

2

$25,000 for the one-hour pilot episode, and to give them a "supervising producer" credit on all episodes in the show's first season. Big Ticket had the option to retain Switzer and Spreckman as producers for each of the next five seasons. Big Ticket promised to pay Switzer and Spreckman 10 percent of the show's "defined proceeds . . . in perpetuity" for any seasons in which they were retained as producers, and 5 percent of the show's "defined proceeds" for any seasons in which they were not retained as producers but "for the life of the series."

## 2. *1999 Settlement*

In 1996, Big Ticket opted not to retain Switzer and Spreckman as producers on the show. In response to a lawsuit Switzer and Spreckman filed against Big Ticket and Spelling Entertainment Group, Inc. (with which Big Ticket was then affiliated), the parties to that litigation entered into a settlement agreement in April 1999 (the 1999 Settlement). Pursuant to the settlement, Big Ticket agreed (1) to pay Switzer and Spreckman $500,000; and (2) to amend the 1995 Agreement to add "Exhibit 1," which defines the residual payments Switzer and Spreckman will receive for the *Judge Judy* show on a going-forward basis. The 1999 Settlement also affirmed that "[a]ll terms and conditions of this Settlement Agreement shall be binding upon and inure to the parties hereto and their respective heirs, successors and assigns."

As pertinent to this case, Exhibit 1 to the 1999 Settlement:

● Defines "Producer" as Big Ticket, and defines "Producer Company" as "Producer and any subsidiary of Spelling Entertainment Group, Inc. (other than Virgin Interactive Entertainment, Inc.)" that engages in distribution of *Judge Judy* episodes.

3

- Defines "Participants" as Switzer and Spreckman, and entitles them to a percentage of the "Defined Proceeds," which is the amount left over after "Distribution Fees," "Distribution Expenses," and "Cost of Production" are deducted from "Gross Receipts." "Gross Receipts," in turn, are defined as "all monies actually received by a 'Producer Company' as consideration for the right to exhibit Episodes."

- Obligates the Producer to give Switzer and Spreckman written statements regarding their defined proceeds as well as to allow inspection of its books upon demand.

- Regulates the Producer's right to sell or dispose of the rights in the episodes of the *Judge Judy* show. More specifically, Exhibit 1 grants the "Producer" "the sole right and discretion to sell or otherwise dispose of any or all of its rights in the Episodes to any Person." Further, Exhibit 1 delineates that any sale of those rights must be *either* (1) "subject to the rights of [the] Participant[s]," which means the buyer must continue paying Switzer and Spreckman the income stream comprised of the above-delineated percentage of defined proceeds; *or* (2) "including any or all rights of [the] Participant[s]," which means the Producer must pay Switzer and Spreckman a lump sum cash-out constituting their percentage (between the two of them—5 percent) of the sale price. Helpfully, Exhibit 1 also spells out how to distinguish a sale "subject to" the Participants' rights from a sale "including" them—namely, a sale is "subject to" the Participants' rights if the buyer "assumes the executory obligations of Producer to Participant" (that is, if the buyer agrees to continue paying the income stream).

4

**C.** *Right of Sheindlin to share the show's residuals*

   1. *1996 Agreement*

In June 1996, Big Ticket entered into a contract with Sheindlin regarding her salary for appearing as Judge Judy in the show (the 1996 Agreement).

   2. *1999 Amendment*

In April 1999, Big Ticket and Sheindlin amended the 1996 Agreement (the 1999 Amendment). Under this amendment, Sheindlin was to be compensated in part by a salary and in part by a percentage of the show's "Defined Proceeds."

   3. *2015 Amendment*

In February 2015, Big Ticket—which by that time was a subsidiary of CBS Studios Inc. (CBS)—and Sheindlin—who by that time was negotiating through a company called Her Honor, Inc. (Her Honor)—signed a further amendment to the 1996 Agreement (the 2015 Amendment). In that amendment, Sheindlin agreed to forego an increase in her salary for three upcoming seasons in exchange for Big Ticket "agree[ing] to transfer ownership of [the] existing [*Judge Judy*] episodes" and the corresponding copyrights ("the Library"). The transfer was not to occur until September 1, 2017, and could occur only after the documents "reasonably necessary to effectuate such [a] transfer" were "execute[d]" by the parties. However, that future transfer of the Library would be "subject to all financial obligations to third-party participants" such as Switzer and Spreckman.

**D.** *Status of the Library*

   1. *Sheindlin tries to sell the Library*

Sheindlin then sought to monetize her right to acquire the Library in September 2017 by finding a buyer.

5

a. Sheindlin secures an amendment to expedite the possible sale

In anticipation of a possible sale, Big Ticket and Sheindlin signed a letter in January 2017 that amended the 1996 Agreement to facilitate "accelerat[ing] the ownership transfer" of the Library. In that amendment, Big Ticket promised to take "commercially reasonable efforts to have the copyright assignment paperwork" attendant to a future transfer of the Library "prepared to submit to the copyright office" once a "binding agreement" between Sheindlin and a buyer was "sign[ed]."

b. Big Ticket sends August 2, 2017 letter

By mid-2017, Sheindlin located a possible buyer—Lionsgate. On August 2, 2017, Big Ticket sent a letter "in connection" with the upcoming "assignment, transfer and sale by [Sheindlin] of all of her rights in the [Library] to a buyer to be designated by [Sheindlin]." In the letter, Big Ticket "hereby transfer[red] and assign[ed]" to Sheindlin and Sheindlin "hereby transfer[red] and assign[ed] to" the unidentified buyer all rights to the Library—although each transfer was "in each case effective at Closing." Once effective, however, both transfers would be "free and clear of any liens, encumbrances or obligations of any kind to third parties or to [Big Ticket]"—*other than . . .* participation obligations to each person or entity entitled to a participation in the receipts of the Judge Judy Show." (Italics added.) Switzer and Spreckman were listed as persons whose "obligations" would continue to bind the buyer after the sale. Big Ticket also promised to "provide each Participant with participation statements," even after the sale.

Sheindlin did not execute the August 2, 2017 letter.

6

### 2. *Sheindlin ultimately decides <u>not</u> to sell the Library, and instead to allow Big Ticket to keep the Library*

In an agreement signed on August 4, 2017, Big Ticket and Sheindlin agreed to take three actions (the August 4, 2017 Agreement). First, Big Ticket paid Sheindlin approximately $99 million in exchange for Sheindlin's agreement that the 2015 Amendment be modified to delete the paragraph that would have transferred the Library to her effective September 1, 2017; Big Ticket would "continue to own the copyright" and have the "sole and exclusive right to exploit" the Library. Second, Big Ticket and Sheindlin agreed that the August 2, 2017 letter was "revoked and of no force or effect" because no sale to a third-party buyer was ever consummated. Third, Sheindlin agreed to "negotiate in good faith" to return as the talent for the 25th (and final) season of *Judge Judy*.

### E. *Status of Payments*

Switzer and Spreckman continued to receive their income stream of residuals from the *Judge Judy* episodes. They were never paid a lump sum cash-out payment.

## II. Procedural Background

### A. *Pleadings*

On January 19, 2018, Switzer and the trustee of The Sandi Spreckman Trust (collectively, plaintiffs) filed suit. In the operative first amended complaint, plaintiffs sued Big Ticket, CBS, Sheindlin, and Her Honor (collectively, defendants)[2] for (1)

---

[2]     Plaintiffs assert that the trial court "incorrectly meld[ed]" various CBS entities involved in the Library transactions, but it appears that it is plaintiffs who are creating confusion over CBS's corporate structure. In any event, plaintiffs' assertion is irrelevant because they did not name any CBS entity as a

breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) intentional interference with contractual relations, (4) unjust enrichment, (5) accounting, (6) declaratory relief, and (7) constructive trust.  Plaintiffs sought a lump sum payment of at least $4.95 million on the theory that the Library was sold twice (first from Big Ticket to Sheindlin, and then from Sheindlin to Big Ticket as a CBS subsidiary), and the second sale triggered their right to a lump sum cash-out payment.

### B.    *Summary judgment*

In August 2021, defendants filed a motion for summary judgment on two grounds—namely, (1) the Library was never sold, so there was no event triggering plaintiffs' right to a lump sum cash-out payment; and (2) even if the Library had been sold, the sale was "subject to" plaintiffs' rights to continue receiving an income stream, so they were still not entitled to a lump sum cash-out payment.  After responsive briefing, a hearing, and a post-hearing brief by plaintiffs, the trial court issued a 21-page order granting summary judgment in favor of defendants.

The trial court sidestepped the first proffered ground for summary judgment, electing to "assume[] without deciding" that the Library had twice been sold.  The court nonetheless granted summary judgment on the second proffered ground after concluding that "the undisputed evidence establishes that any sale . . . was 'subject to the rights of the Participant'"—that is, that the sale contemplated that plaintiffs would continue to

---

defendant in their operative complaint other than CBS and its subsidiary Big Ticket (which executed all of the contracts at issue) and therefore it is only *those* defendants' liability that is at issue in this case.

receive an income stream rather than a lump sum cash-out payment. More specifically, the court pointed to the terms of the 2015 Amendment (which contemplated the transfer of the Library from Big Ticket to Sheindlin) and the August 2, 2017 letter (which, based on the court's assumption, transferred the Library from Big Ticket to Sheindlin, and then from Sheindlin to the as-yet-unnamed buyer)—and how both documents explicitly stated that the sales were subject to plaintiffs' right to a continued income stream. The trial court rejected plaintiffs' primary counter-arguments—namely, that (1) the 1999 Settlement only allowed the "Producer" to sell the Library subject to their income stream; (2) the 1999 Settlement defined "Producer" only as Big Ticket; and (3) the sale from Sheindlin back to Big Ticket, as a subsidiary of CBS, was not a sale by a "Producer," and thus triggered plaintiffs' right to a lump sum cash-out payment. The court reasoned that whoever buys the Library must "step[] into the role of 'Producer' under the" 1999 Settlement because plaintiffs' view that "Producer" only ever denotes Big Ticket would mean that whoever buys the Library would not be required to pay plaintiffs any income stream because the income stream itself is defined in part by the revenue the "Producer" earns (and if the buyer were not a producer, the "Producer" would be earning nothing). The court noted that no extrinsic evidence contradicted its reading of the plain language of the contract.

### C.  *Appeal*

Following the entry of judgment, plaintiffs filed this timely appeal.

9

## DISCUSSION

Plaintiffs argue that the trial court erred in granting summary judgment.

"A defendant is entitled to summary judgment if it can 'show that there is no triable issue as to any material fact.' (Code Civ. Proc., § 437c, subd. (c).) The defendant bears the initial burden of establishing that the plaintiff[s'] cause[s] of action ha[ve] 'no merit' by showing that the plaintiff[s] cannot establish '[o]ne or more elements of [their] cause[s] of action.' (Code Civ. Proc., § 437c, subds. (o) & (p)(2).) If this burden is met, the 'burden shifts' to the plaintiff[s] 'to show that a triable issue of one or more material facts exists as to [those] cause[s] of action . . . .' (*Id.*, subd. (p)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [citation].)" (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 924.) We independently review the trial court's grant of summary judgment, considering all the evidence set forth in the moving and opposing papers except that to which evidentiary objections were sustained and not challenged on appeal, and construing the evidence in the light most favorable to the party opposing summary judgment. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford*); *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534-535.) We review de novo questions of contractual interpretation. (*Yahoo Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 67.) To that end, we are not bound by the trial court's construction of the contract and instead must make an independent interpretation of the contract. (*U.S. Bank National Assn. v. Yashouafar* (2014) 232 Cal.App.4th 639, 646; see generally *Atalla v. Rite Aid Corp.* (2023) 89 Cal.App.5th 294, 307 [reviewing court is "'not bound by the trial

court's stated reasons or rationales'" for granting summary judgment].)

We independently agree with the trial court's grant of summary judgment for defendants because, even if we assume that the Library was *sold* twice (from Big Ticket to Sheindlin and from Sheindlin back to Big Ticket), the undisputed evidence establishes that each of those sales was "subject to" plaintiffs' rights to continue receiving an income stream (rather than a sale that "included" plaintiffs' rights and thus entitled them to a lump sum cash-out payment). At most, three documents effectuated the sales of the Library that we are assuming occurred—namely, (1) the 2015 Amendment that granted Sheindlin the right to acquire the Library on September 1, 2017, (2) the August 2, 2017 letter in which Big Ticket agreed to transfer the Library to Sheindlin, and Sheindlin agreed to transfer her rights to an unnamed "Buyer,"[3] and (3) the August 4, 2017 Agreement in which Big Ticket and Sheindlin agreed that Big Ticket would re-acquire its rights in the Library. All three documents explicitly— and undisputedly—contemplate that each sale of the Library would be "subject to" plaintiffs' rights because such a sale is defined in the 1999 Settlement as being "subject to" plaintiffs' rights when the buyer "assumes the executory obligations" of continuing to pay the income stream, and because all three documents contemplate that the buyer will assume those obligations. (Civ. Code, § 1636 [contract must be interpreted "to give effect to the mutual intention of the parties as it existed at

_____

[3] Because we are assuming, for purposes of our analysis, that the Library was twice sold, we need not respond to defendants' argument that the August 2, 2017 letter was never executed by Sheindlin and therefore cannot constitute a valid contract.

11

the time of contracting"]; *Hartford, supra*, 59 Cal.4th at p. 288 [contract must be interpreted "'in context [and] with regard to its intended function'"].)  The 2015 Amendment specifies that Big Ticket's sale to Sheindlin shall vest Sheindlin with rights in the Library "subject to all financial obligations to third-party participants" (like plaintiffs); the August 2, 2017 letter specifies that the sales from Big Ticket to Sheindlin *and* from Sheindlin to the unnamed buyer will be "free and clear" of "obligations" "other than . . . participation obligations to each person . . . entitled" to participate in the show's receipts; and the August 4, 2017 Agreement effectively identifies the unnamed buyer as Big Ticket, but does so by eliminating the pertinent provisions of the 2015 Amendment and August 2, 2017 letter—thereby placing plaintiffs in precisely the position they were in prior to any sale, which is as recipients of an income stream.

Plaintiffs resist this conclusion with what we view as four categories of arguments.

First and foremost, plaintiffs argue that the 1999 Settlement prohibits anyone but Big Ticket from selling the Library "subject to" their rights because that agreement (1) defines "Producer" as Big Ticket, and (2) grants only the "Producer" "the sole right and discretion to sell" the Library— either through a sale "subject to" plaintiffs' income stream or a sale that "includ[es]" a lump sum cash-out payment for plaintiffs. Like the trial court, we reject this construction of the 1999 Settlement as unreasonable for two reasons.  To begin, if we were to accept plaintiffs' argument that only Big Ticket is a "Producer," then once Big Ticket sold the Library to Sheindlin "subject to" plaintiffs' income stream, Sheindlin would have been free not to pay plaintiffs *anything* because their income stream is

12

a calculation of a proportion of "Gross Receipts," which is the money that the "Producer" receives—yet it would be Sheindlin (and not Big Ticket) receiving that money; if "Producer" were limited to Big Ticket, then the gross receipts would be zero, and a fraction of zero is still zero.  Along similar lines, if "Producer" could only mean Big Ticket, Sheindlin would have also been free not to give plaintiffs a written statement of the gross receipts and to ignore their demands for inspecting the company records pertinent to those receipts.  These are absurd results, and yet they flow inexorably from plaintiffs' construction of the word "Producer"—a definition we must apply consistently across the entirety of the 1999 Amendment.  (Civ. Code, § 1638 [language of contract must be interpreted to avoid "absurdity"]; *Eith v. Ketelhut* (2018) 31 Cal.App.5th 1, 19 [courts must construe contract to avoid an interpretation which would result in absurdity]; Civ. Code, § 1653 ["inconsistent" interpretation of the same word must be rejected].)  Further, if we were to accept plaintiffs' construction of "Producer" and limit the right to sell the Library "subject to" plaintiffs' income stream solely to Big Ticket, we would be chipping away at the rights that Big Ticket's assigned buyer would have to sell the Library—in derogation of the 1999 Settlement's mandate that the contract is to "inure[] to the benefit" of Big Ticket's "assigns" to the same extent as Big Ticket itself.  (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"]; *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507 [courts "give effect to all of a contract's terms, and . . . avoid interpretations that render any portion superfluous, void or inexplicable"].)

13

Plaintiffs respond with two further points. They assert that a buyer of the Library may "assume the Producer's executory obligations" without *itself* becoming the "Producer," which means that Scheindlin could *buy* the Library from Big Ticket but—because she is not the "Producer"—could not *sell* it to anyone else without paying plaintiffs a lump sum cash-out. We reject this assertion. For starters, it leads to a result that cuts against the result plaintiffs want. If, as plaintiffs urge, Sheindlin is not a "Producer," then she could not sell the Library *at all* because the 1999 Settlement vests the "sole" power to sell in the "Producer"; and if there can be no second sale, plaintiffs are left receiving an income stream from the first sale until the end of time.[4] To the extent plaintiffs are suggesting that Sheindlin is the "Producer" for purposes of a sale of the Library a second time—but only a

_____

[4] For the first time at oral argument, plaintiffs argued that Sheindlin breached her contract by selling the Library *at all*. Plaintiffs have waived this newly minted theory by raising it for the first time during rebuttal at oral argument on appeal; it is nowhere in the operative complaint, and cannot be used to evade summary judgment (which, by definition, is framed by the operative pleadings). (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7 [argument raised for the first time at oral argument waived]; *Heritage Marketing & Ins. Services, Inc. v. Chrustawka* (2008) 160 Cal.App.4th 754, 764 ["[t]he pleadings frame the issues on a motion for summary judgment"].) But even if we were to excuse plaintiffs' waiver, this new theory is wholly irreconcilable with plaintiffs' position elsewhere in the litigation, which is predicated upon Sheindlin's valid sale of the Library. What is more, plaintiffs' new theory is also irrelevant because their decision to try to plead multiple, inconsistent theories about the meaning of the 1999 Settlement in no way affects our independent examination of what it must mean as a matter of law for purposes of summary judgment.

sale "including" a cash-out to plaintiffs—then plaintiffs are saying that Sheindlin is a "Producer" when it comes to effecting a sale that "includes" a cash-out but *not* a "Producer" when it comes to effecting a sale "subject to" a continuation of plaintiffs' income stream. In other words, Sheindlin would have to be a producer and *not a producer* at the same time. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 475 [contract must be interpreted so that "same word" is given the "same meaning" throughout the contract]; but see *Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1071 ["same meaning" rule does not apply where same words are used separately and distinctly].) Sheindlin is a talented actor, but she is not Schrödinger's cat.[5] Plaintiffs further assert that the fact that the 1999 Settlement grants Big Ticket a release (which plaintiffs characterize as a "novation" without any citation to authority) if Big Ticket sells the Library "subject to" their income stream (but not if Big Ticket pays out a lump sum) somehow "confirms that the [buyer] does not implicitly become the Producer," but the provision releasing Big Ticket from "any further obligation to" plaintiffs reflects nothing more than the fact that a sale "subject to" a continuing duty to pay an income stream would necessitate identifying who is on the hook for that stream—whereas a sale that had a continuing duty would not. We do not see how the release otherwise supports plaintiffs' assertion.

---

[5]    In 1935, Austrian physicist Erwin Schrödinger hypothesized that a cat placed in an opaque box that would, in the future, poison the cat half the time was (until the box was opened and it was observed whether the poison was triggered) both alive *and* dead.

15

Second, plaintiffs argue that the August 4, 2017 Agreement constitutes extrinsic evidence of what the parties were thinking when they drafted the 1999 Settlement—specifically, the August 4, 2017 Agreement is proof that the parties were trying to erase their earlier transactions that would have triggered a duty to pay plaintiffs a lump sum cash-out. This argument lacks merit for a number of reasons. To begin, the trial court ruled that plaintiffs did not offer up the August 4, 2017 Agreement as extrinsic evidence at any point during the summary judgment proceedings. Plaintiffs challenge that ruling on appeal by collaterally attacking the trial court's settled statement—but this is beyond our purview to review. (*Marks v. Superior Court* (2002) 27 Cal.4th 176, 195 [trial court has "'full and complete power'" to make a final determination of the content of the settlement statement, absent a showing the court acted arbitrarily]; *Sidebotham v. Superior Court* (1958) 161 Cal.App.2d 624, 628 [appellate court has "no familiarity with the oral proceedings" from the trial court and therefore has no basis to "measure the adequacy or inadequacy" of the settled statement].) This argument also fails on its merits. Plaintiffs' chain of logic seems to be that Big Ticket and Sheindlin schemed to deprive plaintiffs of their lump sum cash-out payment, which plaintiffs argue is shown by the August 4, 2017 Agreement's rescission of the transfer provisions in the 2015 Amendment and the August 2, 2017 letter, which thus raises questions of fact about whether Big Ticket and Sheindlin engaged in the scheme because they *knew* their prior actions required a lump sum cash-out payment. But this chain of logic assumes its own conclusion—namely, that Big Ticket and Sheindlin concocted a scheme. What is more, the parties to the August 4, 2017 Agreement are not the same as the

16

parties to the 1999 Settlement, so their actions have no bearing on the intent of the 1999 Settlement.

Third, plaintiffs argue that there are questions of fact regarding whether the Library was sold. Yet we have assumed for purposes—and the benefit—of plaintiffs' claim to a lump sum cash-out payment that the Library was sold, so any questions of fact are immaterial and hence not a bar to summary judgment.

Fourth and lastly, plaintiffs argue that they are third-party beneficiaries of the contracts between Big Ticket and Sheindlin effectuating sales of the Library, and hence have a right to insist that the sales require a lump sum cash-out or a right to stop the purported rescission of the transfer provisions in the 2015 Amendment and August 2, 2017 letter effectuated by the August 4, 2017 Agreement.[6]  This argument lacks merit. The 1999 Settlement makes crystal clear that the "Producer" has "the *sole* right and discretion to sell or otherwise dispose of any or all of its rights in the Episode to any Person." (Italics added.) This language unambiguously refutes any notion that plaintiffs have any input—let alone a veto power—on the terms of any future sale. And plaintiffs' asserted right to object to any rescission effected by the August 4, 2017 Agreement would, in the end, leave the two-step sale of the Library intact, yet the undisputed facts show that plaintiffs are not entitled to any lump sum cash-

[6]     It is not entirely clear what plaintiffs are arguing because they raise this issue in passing without any citation to the record or any legal authority; we therefore have done our best to articulate what plaintiffs may be attempting to argue.

17

out by virtue of that sale, so a right to object—even if it exists—does them no good.[7]

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

---

[7]    For the same reason, plaintiffs' argument that the August 2, 2017 letter, which we have assumed effectuated sales of the Library from Big Ticket to Sheindlin and from Sheindlin to an unnamed buyer, also states that those sales could not be "rescind[ed], cancel[led] or terminate[d]" fares no better.